## THE WILLIAM E. REIS.

### (District Court, N. D. Ohio, E. D.   February 15, 1906.)

#### Nos. 2,380, 2,383, 2,386.

COLLISION—VESSEL DRIFTING FROM MOORINGS—NEGLIGENT INATTENTION TO LINES.

The William E. Reis, a steam propeller weighing with the cargo of ore on board about 8,000 tons, was moored for the winter at a dock in Cuyahoga river at Cleveland being fastened to the wharf by a number of lines. A flood due to heavy rains and melting snow occurred during the winter, and for two or three days the water rose and when it had risen five feet the Reis broke from her moorings by reason of the parting of all of her lines, and drifted against and injured a number of vessels moored below. It appeared by a preponderance of evidence that the fastenings would have been reasonably sufficient if they had been properly adjusted, but that they were not, and, in consequence, they were probably broken by the unequal strain to which they were subjected by the lifting of the vessel. The only person left on board in charge during the rising of the water was a boy without experience, and physically unable to properly adjust the lines. It also appeared that no other of the numerous vessels moored in the river broke loose. *Held*, that the vessel had not sustained the burden resting on her to show that her drifting was the result of inevitable accident or of a cause which due care and nautical skill could not have provided against, and that she was liable for the resulting damages.

[Ed. Note.—For cases in point see vol. 10, Cent Dig. Collision, § 85½.]

In Admiralty.   Suits for collision.

Roger M. Lee, for F. M. Osborne, and Kelley Island Transport Co. and others.

Hoyt, Dustin & Kelley, for Pittsburg S. S. Co.

Goulder, Holding & Masten, for The William E. Reis.

TAYLER, District Judge.   About 8 o'clock on the morning of January 22, 1904, the steam propeller William E. Reis, which had been tied to the dock with her bow upstream, broke away from her moorings in the Cuyahoga river, a few hundred feet above the Columbus Street Bridge, Cleveland, and drifted, stern first, toward Lake Erie. A short distance below the bridge she struck the stem of the steam propeller John W. Moore, and broke her adrift; the Moore struck the steam propeller James B. Eads, which was tied up immediately below, broke her adrift, and all three vessels drifted down the river and brought up against the Superior Street Viaduct. The Reis also struck and damaged the barge Fanny Neil.

Libels were filed by the owners of the Moore, the Eads, and the Neil, against the Reis, alleging in substance, among other things, the facts above stated, and charging against the Reis the following faults: (a) That the Reis did not have out proper or sufficient winter moorings for such a position as she occupied in the river. (b) That those in charge of the Reis negligently failed to take proper and seamanlike precautions to prevent her breaking adrift from her moorings in view of the rising water and the threatening conditions impending prior to the morning of January 22d. (c) That those in

charge of the Reis negligently failed to look after and properly care for such moorings as the Reis had out. (d) That the person or persons in immediate charge of the Reis were incompetent, and inattentive to their duties. (e) That the anchor equipment of the Reis was negligently permitted to be and remain in such condition that both of said vessel's anchors could not be promptly put in use. (f) That the person or persons in charge of the Reis negligently failed seasonably and properly to use her anchor or anchors in order to prevent her drifting down with the current after she had so broken adrift.

The damage sustained by the Moore is alleged to amount to the sum of $18,204.82; by the Eads, $6,000; and by the Neil, $485.36. An order was made consolidating the cases.

The Reis was a vessel of nearly 5,000 gross tons burden. She had brought down a load of ore, part of which had been unloaded, but the greater part of her cargo remained on board. At the time of breaking away, she weighed, with her cargo, nearly 8,000 tons. When laid up, early in December, 1903, her fastenings were, according to the testimony of her master and crew, as follows: An 8-inch manila line, leading ahead some 30 feet from her forward starboard tow chock, to a pile on the dock. The first fastening abaft of this was six parts of a 6-inch manila line, leading from the breast chock in the windlass room to the dock timbers on the dock; three of these parts leading quartering ahead, and three parts about 45 degrees forward of abeam. From her forward deck engine, a short distance abaft of her forward house, she had a ⅞-inch steel cable leading ahead, and one astern; also three parts of a 6-inch manila line leading ahead. From her amidships timberhead, abreast of her amidships deck engine, she had a ¾-inch wire cable leading ahead. From her after deck engine, she had a ⅞-inch steel cable leading ahead, and another one astern; and from the same chock she had two parts of a 6-inch line leading ahead. From the after chock she had three parts of a 6-inch line, two leading ahead, and one leading astern. These lines were all made fast to dock timbers and piles on the dock; and, where bights were put out, these were fastened around dock timbers with toggles. The lines had various leads, some short, and some long, but it is impossible, from the testimony, to give their definite length.

There is a serious conflict in the proof as to whether the Reis was shifted, after being tied up by her master in December. I am inclined to the opinion that she remained in the same position, with the same fastenings. In any event, it is not contended that her fastenings were any more secure at the time when she broke away than when she was tied up. Early in January, 1904, there had been a heavy fall of snow, followed by cold weather, which formed much ice. and also prevented the melting of the snow. About the 18th, the temperature rose rapidly, the ice and snow melted, and a heavy fall of rain accompanied it, continuing for three or four days. The result was a very unusual—perhaps an unprecedented—winter flood. There had been, however, much greater floods in the spring and summer months. Owners and masters were warned, through the newspapers and otherwise, that a freshet was impending; and the evidence shows that such

a general sense of alarm was felt as to cause the taking of extra precautions by the owners, and those in charge, of vessels. Nothing was done by those in charge of the Reis to make her more secure, but her "shore captain," who lived aboard another vessel some distance away, claims that he examined her fastenings two days before the accident, and found them secure and sufficient. It also appears that several masters of the Corrigan boats, one of which was tied up immediately below the Reis, made some examination of her fastenings the afternoon before she broke away, and they testify that, in their opinion, the fastenings were sufficient, in view of the high water then and to be expected. The water rose gradually, but somewhat more rapidly Thursday night and Friday morning. At the time the Reis broke loose, the water was about five feet higher than it stood before the thaw set in. It is difficult to say just which of her lines first parted, but it does appear that her stern swung out before she had drifted any distance, because the Case which lay only 20 or 25 feet below the Reis, was not touched by her. Certain it is that every one of her lines and cables parted, and that no dock fastening gave way. The management of these lines and cables, by the shipkeeper of the Reis, will be referred to later on.

The rule of law applicable to this case is stated in The Louisiana, 3 Wall. 164, 18 L. Ed. 85, as follows:

"The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major which human skill or precaution and a proper display of nautical skill could not have prevented."

An examination of the testimony with reference to the application of this rule of law to the facts of this case discloses two duties laid upon the owners of the Reis: (1) That her fastenings should be secure and suitable to sufficiently hold her to the dock, in view of any flood or force which might reasonably be apprehended as likely to affect her; and (2) that these fastenings should be kept in such adjustment, between the boat and the dock, as to prevent any undue strain from coming upon them in consequence of the lifting of the vessel by reason of the rising of the water.

1. As to the character of the fastenings, there is great conflict. I think it is fair to say that taking the testimony of the master of the vessel and those who originally tied her up, and the testimony of those who examined her fastenings the day preceding the accident, and giving full weight to the contrary testimony of libelants' witnesses, these fastenings were such as would satisfy a prudent navigator that they were sufficient, if kept in proper adjustment, to repel the force of any flood reasonably to be apprehended. On this subject, a large amount of testimony was taken, and much argument expended. In view of the conclusion to which I have come respecting the other duties of those in charge of the Reis, it is not necessary to devote further time to this branch of the case.

2. An examination, however, of the testimony, and a disclosure of the facts, which are reasonably well established, connected with the management of this vessel during the night and immediately before

the vessel broke away, satisfy me that her owners were wanting in such care as ordinary prudence would dictate in respect to the manipulation—the easing and taking in the slack—of these fastenings, during the critical hours preceding the accident.

The Reis was a vessel weighing, with her cargo, nearly 8,000 tons. If we assume that she was securely fastened to this dock, we discover that she was left there, with this stupendous weight, in a rising river, which, in fact, rose about five feet, in charge of a mere boy, less than 20 years old, whose experience as a sailor comprised four trips on the lakes, with a preliminary training of one season as a second cook. This large vessel, with her heavy cargo, lifting with the rise of the water, and, lifting, subjecting her cables and lines to an enormous strain, was not only left in charge of one person, but of a boy wholly inexperienced in such matters, and certainly not possessed of capacity or experience to meet a serious emergency like this.

He testifies that the evening before the accident the bow of the Reis stood out some 8 or 10 feet from the dock, and that during the night, on account of the rise of the water, she had gone in until she was three or four inches, at the turn of her bow, from the dock. Thus, such slack as there was in her lines was being rapidly taken up by the lifting of the vessel; and, the moment that a severe strain came upon these lines, due to the lifting, they would almost immediately, of necessity, part. If she had had twice as many lines out as the respondents claim she had, and they were not properly adjusted so as to distribute the strain through them all, and, indeed, so as to wholly relieve them from any strain due to the rise of the vessel with the rising water, they would have parted just the same. In my opinion, this is the way this accident occurred. He claims that during the night he eased up three lines—the last one at 2 o'clock or before; yet the river continued rapidly to rise from that time until after the breaking away of the vessel, a period of six hours. He did not ease these lines up more than a few inches, some six or eight inches, or thereabouts. But here were many lines and cables, of various lengths, leads, and angles. If it is at all essential to the safety of a vessel, under circumstances such as existed at this time, that lines and cables should be slacked off in order to make provision for the rising of the water and the consequent lifting of the vessel, then it was to the last degree necessary that that work should be done on a heavy vessel like this, with the greatest care, and many times; and this could only be done by a competent person or persons. The expert navigators called by the libelants insist that it would take several men to accomplish this work; and that it ought to be done frequently. But, however that may be, it is apparent that this young and inexperienced boy was incapable of knowing what to do, and, if we believe the witnesses for the libelants, physically incapable of doing what was necessary to be done.

As Mr. Justice Grier said, in the case of The Louisiana, that "it requires no assumption or affectation of any very great nautical skill in this court to point out the defects of the management of this vessel," so it may be said here that it requires no assumption or affectation of any very great nautical skill in this court to point out that, under

the admitted circumstances of this case, it required the highest degree of care throughout the night of the 21st and 22d of January, 1904, while this flood was rapidly rising, to adjust and readjust, as the need might be, the lines and cables by which this vessel was made fast to the dock. The shore captain, whose duty it was to look after the Reis, was aboard another vessel, which was in his charge, safely moored in the quiet waters of the old river bed, where there was little danger; and left the Reis, with the grave necessities of the situation, to the care of an inexperienced keeper. It is apparent that it was due to the failure to properly slack or take in the slack of these lines, so as to distribute the strain upon them, or to relieve them from any strain from the rising vessel, that this accident occurred. If it was the force of the flood, as distinguished from the pull of the vessel due to its being elevated by the rising waters, which caused it, then it was caused by reason of the fact that the strain was not distributed throughout the fastenings, but was concentrated on one or more of them, wherefore they gave way. In either event, it would be due to the failure of the shipkeeper to properly attend to the fastenings.

In the case of the Louisiana, the court says:

"The drifting of this vessel was not caused by any sudden hurricane which nautical experience could not anticipate. None of the other numerous vessels, at that time in the harbor, were driven from their moorings."

The same fact appears in this case. None of the other vessels tied up along the Cuyahoga river—and there were many of them—escaped from their moorings. It is true the claim is made that a vessel broke away at Lorain, and another or two at Buffalo; but it cannot be contended that any certain comparison can be made between those cases and this, because conditions may not have been, and probably were not, the same. The suggested fact, which seems to have had weight with the Supreme Court in the case of the Louisiana, is that no other vessel, similarly situated, did break from her moorings. I am satisfied that the weight of the testimony establishes the fact that the owners of the Reis were grossly negligent in their failure to suitably care for the handling of this vessel during the period of the rising flood; and this is true, whatever may have been the sufficiency of the fastenings. She broke away either because the strain on her lines was not suitably distributed, so as to withstand the force of the flood's current or because they were not suitably slacked to correspond with the lifting of the vessel due to the rising of the water.

Complaint is made as to the anchors on the Reis, and the failure of the shipkeeper to promptly handle them after the vessel broke loose. The weight of the testimony discredits the statement of the shipkeeper, that he dropped the starboard anchor immediately after the Reis broke loose. Whether this be true or not, it is too speculative to enquire as to what would have happened if the anchors had been properly dropped. The fault for which the Reis must be held responsible had already occurred.

A decree may be drawn in favor of the libelants, and against the respondents, with the usual reference for the assessment of the damages to which each libelant is entitled.