**SWENSON v. THE ARGONAUT et al.**

**THE ESTELLE.**

**THE SUSAN.**

Consolidated Cause No. 10812 (Including Causes Nos. 10811–10815, 10823–10827).

United States Court of Appeals
Third Circuit.

Argued Jan. 8, 1953.

Decided May 7, 1953.

Rehearing Denied June 4, 1953.

McLaughlin, Circuit Judge, dissented.

Frank C. Mason, New York City (Cruse, Becker & Longstreet, Jersey City, N. J., Mahar & Mason, New York City, on the brief), for appellants in Nos. 10812 to 10815, inclusive.

Robert S. Erskine, New York City (Cox & Walburg, Newark, New Jersey, Kirlin Campbell & Keating, New York City, on the brief), for Farrell Lines, Inc.

Logan Cresap, Jr., New York City (John B. Gest, Philadelphia, Pa., on the brief), for Hercules Co.

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

A brief prologue may perhaps serve to soften the impact of a subsequent inevitably detailed recital of a complex sequence of litigation in the United States District Court for the District of New Jersey and appeals and cross-appeals in this Court.

On August 15, 1947, the steamship Argonaut owned by Farrell Lines Incorporated ("Argonaut") was moored to a pier in Jersey City, New Jersey operated by a group of individuals trading as The Hercules Company ("Hercules"). The Argonaut broke adrift in a storm damaging a catamaran and four barges moored at the foot of the same pier.

The owners of the damaged craft ("Libellants") brought four separate actions in admiralty[1] against Argonaut charging it with negligence. Argonaut answered denying negligence on its part, and by petition impleaded Hercules in each of the four suits charging that its breaking adrift was due to the pier's defective and inadequate mooring facilities. Hercules answered the impleading petitions denying negligence and counter-claimed and cross-libeled Argonaut for damages to the pier.

Argonaut added to the roster of the four aforementioned suits with a fifth separate action against Hercules seeking recovery for damages to the steamship Argonaut, and Hercules, in its answer denying any negligence on its part, also counter-claimed and cross-libeled for damages to its pier.

The five suits by stipulation of all the parties involved came to trial in the District Court as a consolidated case.

After hearing, the District Court in a Consolidated Final Decree dismissed the four suits brought by the Libellants; Argonaut's impleading petitions and Hercules' counter-claims and cross-libels therein; and Argonaut's separate suit against Hercules and the latter's counter-claim and cross-libel therein.

The District Court's dismissals were premised on its determination that (1) the steamship Argonaut was moored in a seamanlike manner; (2) Hercules' pier and its facilities were properly constructed and maintained; and (3) "the accident was the result of an inevitable and unforeseeable force (sudden storm) which could not have been protected against by the degree of nautical skill required of the operators of the ship or the dock".

In a veritable Donnybrook Fair melee all and sundry involved in the five separate actions below have filed appeals from whatever aspect of the Consolidated Final Decree which was adverse to them.[2]

---

1. Two of the barges had the same owner.

2. The numbers and captions in the appeals of the four Libellants from the dismissal of their four separate actions are respectively:

No. 10,812—John Walter Swenson, as owner of the coal boats Estelle and Su-san, Libellant-Appellant, v. Steamship Argonaut, American South African Line, Inc., now known as Farrell Lines Incorporated, Claimant-Appellee. James Hanna, Margaret Hanna, John LaVeck and Eleanor LaVeck, co-partners doing business as The Hercules Company; The

Appreciative of the complexities of the situation, all the parties have here entered into a Stipulation consolidating their separate appeals under Consolidated Cause No. 10,812. The Stipulation provides that our decision in this Consolidated Cause will be dispositive of all the appeals.

As we have frequently observed, an appeal in admiralty partakes of a trial de novo and serves to vacate the decree of the District Court; the findings of the latter when supported by competent evidence are entitled to great weight and should, therefore, not be set aside on appeal except upon a showing that they are clearly wrong.[3]

On this score it must be noted that the District Court's Findings of Fact with respect to the sequence of events on the day of the accident are undisputed. They are as follows:

On August 15, 1947, the Steamship Argonaut was moored in the outer berth on the north side of the dock at the foot of Washington Street in Jersey City.[4] Dock trials had been had in the morning and extra lines were put out and had not been removed at the time of the accident. The lines were as follows: forward and aft lines, including spring lines and one breast line.[5] The breast line was one of two[6] attached to the dock and belonging to Her-

Hercules Co., Inc., Respondents-Impleaded-Appellees.

No. 10,813—Terminal Operating Co., Inc., as owner of the Catamaran No. 6, Libellant-Appellant, v. Steamship Argonaut, American South African Line, Inc., now known as Farrell Lines Incorporated, Claimant-Appellee. James Hanna, Margaret Hanna, John LaVeck and Eleanor LaVeck, co-partners doing business as The Hercules Company; The Hercules Co., Inc., Respondents-Impleaded-Appellees.

No. 10,814—M. H. Buck, as owner of the covered barge Roy H, Libellant-Appellant, v. Steamship Argonaut, American South African Line, Inc., now known as Farrell Lines Incorporated, Claimant-Appellee. James Hanna, Margaret Hanna, John LaVeck and Eleanor LaVeck, co-partners doing business as The Hercules Company; The Hercules Co., Inc., Respondents-Impleaded-Appellees.

No. 10,815—Alfred Tuitt, as owner of the Barge Key West, Libellant-Appellant, v. Steamship Argonaut, American South African Line, Inc., now known as Farrell Lines Incorporated, Claimant-Appellee. James Hanna, Margaret Hanna, John LaVeck and Eleanor LaVeck, co-partners doing business as The Hercules Company; The Hercules Co., Inc., Respondents-Impleaded-Appellees.

Argonaut appealed from the dismissal of its separate libel against Hercules in

No. 10,823—Farrell Lines Incorporated, as demised charterer of the Steamship Argonaut, Libellant-Appellant, v. James Hanna, Margaret Hanna, John LaVeck and Eleanor LaVeck, co-partners doing business as The Hercules Company; The Hercules Co., Inc., Respondents-Appellees.

Argonaut appealed in Nos. 10,824 to

10,827, inclusive, from the dismissal of the petitions by which it impleaded Hercules in the Libellants' four actions against it.

Hercules appealed in No. 10,811 from the dismissal of its counter-claims and cross-libels in the four actions in which it was the impleaded-respondent and the fifth action (brought by Argonaut) in which it was respondent.

Argonaut and Hercules admit that their appeals are of a protective nature—designed to serve as an "anchor to windward".

3. Bentley v. Albatross Steamship Co., 3 Cir., 203 F.2d 270; Read v. United States, 3 Cir., 1953, 201 F.2d 758.

4. The Argonaut was moored port side to the pier, stern out toward the stream, with her bow under the stern of the SS Annibal, which was also moored at the same pier, in the in-shore berth. The Argonaut had a gross tonnage of 7,604 and displacement of between 10,000 and 11,000 tons. She was 459 feet long, had a freeboard of about 20 feet, and in the position in which she was lying near the outer end of the pier her stern extended beyond the pier and into the river for a distance of about 180 feet. Moored on the opposite side of the slip, and on the southerly side of the next pier to the northward, were the boats Estelle, Susan, Key West and Roy H. and a catamaran known as the No. 6.

5. There were altogether four lines forward, leading from the bow to a bollard on the dock, four lines aft, leading from the stern to a dolphin cluster piling beyond the end of the dock, fore and aft spring lines to prevent surging forward

cules. The breast line used parted during the accident, but none of the ship's lines did. The aft or stern lines were fastened to a pile cluster aft of the dock and abreast the stern of the ship. In the late afternoon of August 15, 1947, about 5 P.M., a storm of about twenty minutes duration arose. Its center was localized in the vicinity of the ship and during its course the force of the wind increased from twenty to forty and then to sixty miles per hour. The sudden increase in the force of the wind was strong enough to cause the pile cluster to lay over and snap a steel wire and to rupture a bollard so that it split, although the fastenings of the bollard remained without breaking loose. Due to the laying over of the pile cluster, the lines running from the ship to the pile cluster slipped off.

It is readily discernible that the fact findings above recited relate to the physical facts of the accident. The Libellants vigorously take issue with the District Court's determination that they disclose that "The steamship Argonaut was moored in a seamanlike manner".

There was one additional Finding of Fact which concerned the question as to whether er notice had been given by the United States Weather Bureau of the storm on the evening of August 15th. The District Court made the fact finding that "The storm was not foreseen by the United States Weather Bureau, which did not put out a storm warning." The Libellants dispute that fact finding. The record on that score reveals:

Benjamin Parry who was Chief of the United States Weather Bureau's New York office on the day of the accident, testified that " * * * more than 24 hours, probably 36 hours advance notice" had been given of the thunder storm on the evening of August 15th.[7] He also stated that the weather forecast correctly indicated the extent of the storm.[8]

Of critical significance is the further testimony of Mr. Parry that the storm was a typical summer thunder storm—common for the locality, and that the incidence of a 60 mile-an-hour wind was not extraordinary.[9]

The United States Weather Bureau record for August 15th, offered in evidence, contained this description of the storm, "A severe thunder storm moving rapidly from west to east, accompanied by hail."

This disinterested expert characterization of the storm as "a severe thunder storm" and typical summer thunder storm common for the locality, bears significantly on the District Court's determination that the breaking adrift of the Argonaut was an "inevitable accident".

or astern, and one breast wire, amidship attached in some manner to the dock and running perpendicular to the ship. The bollard to which the bow back spring lines were tied was the last one on the north side of the pier.

6. The breast line which was not used was located between the breast wire used and the end of the pier, 15 feet in from the end.

7. In response to the question "What notices were issued on August 14 and 15?" Mr. Parry replied:
"Included in the regular forecast which the broadcasters over the radio issue to newspapers, and also in part of our daily weather bulletin we issued a forecast of thunder storms on the 14th and said for the 15th thunder storms by evening, and then that was repeated again on the morning of the 15th, so that there was more than 24 hours, probably 36 hours advance notice."

8. In response to the question "In your opinion did the notices issued by the Weather Bureau on August 14 and August 15 correctly indicate the storm which happened on the afternoon of August 15?", Mr. Parry replied:
"In general, yes. I haven't the exact wordage but it is my recollection the terminology was used 'scattered thunder storms indicated.'"

9. "Q. Now, have we experienced hailstones in other summer thunder storms? A. Oh, many times.
"Q. Have we in the vicinity of New York during the summer season experienced during thunder storms wind velocity of 52 miles an hour? A. Yes, indeed.
"Q. And 60 miles an hour? A. And sixty.
"Q. In other words, this storm you might say was common for this locality in the summer period? A. Storms of this type, yes."

■ It is crystal clear from the questions asked Mr. Parry by the trial judge; his "Oral Conclusions" stated at the conclusion of the trial; and his Findings of Fact and Conclusions of Law, that he premised his application of the principle of "inevitable accident" on his assumption that the thunder storm was of such unusual nature and "terrific" violence as to be of cyclonic or hurricane proportions; that it had not been "foreseen" by the Weather Bureau and could not have been "foreseen by the master of the vessel". The record establishes that the District Court erred in these respects; that on the contrary the storm was not "catastrophic" nor "of so unusual a character" that a case of inevitable accident was made out;[10] while the storm was severe it was "expectable" during the summer;[11] and it was not "irresistible, overwhelming, and extraordinary for the particular time of year to be a good exception and not a common occurrence at that season of the year".[12]

Apart from these considerations and assuming even that the District Court was correct in its appraisal of the nature of the storm, it erred in its application of the principle of "inevitable accident".

■■ It is well-settled that the burden of proving inevitable accident is "heavily" upon the party asserting that defense;[13] that a finding of inevitable accident is "not to be lightly arrived at";[14] that the respondent must affirmatively establish that the accident "* * * could not have been prevented by the use of that degree of reasonable care and attention which the situation demanded",[15] and that there was no intervening act of negligence on its part;[16] when a collision is caused by a vessel drifting from her moorings there is a presumption of fault on her part and "she must be liable * * * unless she can show affirmatively that the drifting was the result of inevitable accident, * * * which human skill and precaution and a proper display of nautical skill could not have prevented." [17]

■ Applying these principles, we are of the opinion that the Argonaut failed to discharge her heavy burden of proving inevitable accident; that she did not rebut the presumption of fault nor show affirmatively that there was no intervening act of negligence on her part; nor did she establish that she had exhibited in her mooring the degree of reasonable care and attention which the situation demanded and finally that she did not prove that her drifting could not have been prevented by the use of proper nautical skill.

The record literally bristles with affirmative proof of the negligence of the Argonaut. Captain Donnelly, her Master, testified that when he was contemplating going ashore some twenty minutes before the Argonaut broke adrift he observed "obviously threatening weather" (darkening skies) toward the southwest[18] and "decided to

10. The Rob, 2 Cir., 1941, 122 F.2d 312.

11. Cf. The Norte, D.C.E.D.Pa.1947, 69 F. Supp. 881, 887; The Vizcaya, D.C.E.D. Pa.1945, 63 F.Supp. 898, 903.

12. The Manuel Arnus, D.C.S.D.N.Y.1935, 10 F.Supp. 729; Eastern Gas & Fuel Associates v. Martin Marine Transp. Co., 3 Cir., 1951, 190 F.2d 394.

13. The Lackawanna, 2 Cir., 1913, 210 F. 262, 264; The Anna C. Minch, 2 Cir., 1921, 271 F. 192, 195; The Philip J. Kenny, 3 Cir., 1932, 60 F.2d 457, 458; The Rob, supra note 10; Sargent Barge Line, Inc., v. The Wyomissing, 2 Cir., 1942, 127 F.2d 623.

14. The Bayonne, 2 Cir., 1914, 213 F. 216, 217; Palmer v. City of New York, D.C. S.D.N.Y.1942, 43 F.Supp. 43.

15. The Rob, supra, note 10. [122 F.2d 313.]

16. The Philip J. Kenny, supra note 13.

17. The Louisiana, 1866, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; The Buffalo (The President) 2 Cir., 1932, 56 F.2d 738.

18. "Well, I was going to leave the ship about five o'clock and when I came out on deck I noticed the darkening of the sky to the southwest, obviously threatening weather, so as it was my first command I decided to wait and see the blow, see how everything rode out, and I went back in my room and sat down, I don't know whether I wrote or what I did, but the next thing I knew somebody called and told me the ship was adrift, the stern had broken free."

wait and see the blow". Despite all this, however, Captain Donnelly made no further inspection of his mooring lines and took no action with respect to them.[19] He just went to his quarters and remained there until he was advised that the ship had broken adrift.

In response to an inquiry as to whether the mooring lines were "secure as they could be made" Captain Donnelly stated: "That is correct, secure as good seamanship would dictate under those circumstances." When questioned as to what he meant by "circumstances" he replied: "In this particular instance there wasn't the available bollards that you would normally have on a dock to run other lines or other leads other than to this pile cluster."

It may be noted that Chief Mate Valentine of the Argonaut disclosed that he too at 5 P.M. observed " * * * the indications of a possible thunder shower" but despite that fact did nothing toward checking the vessel's moorings.

The inaction of the Argonaut's Master and Chief Mate during the 20 minutes which elapsed between their observation of the threatening storm and the vessel's drifting, speaks volumes inasmuch as they both admitted that as "good seamen" they had been "concerned about the method of mooring" during the dock trials because of what they considered inadequate docking facilities.

Valentine, in his deposition, frankly stated with respect to the fact that he had noted in the Argonaut's log that "the method of mooring was the only alternative",[20] that " * * * it is not considered sound seamanlike practice to put all your lines on

one bollard or one dolphin, for that very reason that if we had three or four we could have distributed the load more evenly."

Captain Donnelly expressed complete agreement with Valentine's statement. Moreover, he admitted that " * * * this cluster was overloaded and showed it by pulling over"; further " * * * if you overload it is not good practice." However, like his Chief Mate, the Master insisted that "there was no other alternative" in view of the fact that additional bollards and clusters were not available.[21]

Thus, the sum total of Argonaut's position, by its own testimony, is that it overloaded available mooring facilities; that it was not good seamanship nor good nautical practice to do so and that its officers were "concerned" by what they did—but there was no other alternative because of the asserted lack of mooring facilities on the pier.

It is evident from the above that the vessel's Master and Chief Mate "have damned with faint praise" the vessel's mooring and that Argonaut has fallen far, far short of meeting the heavy burden imposed on it by law to establish that its mooring was consonant with the degree of nautical skill and care essential to make available to it the defense of "inevitable accident".

In view of that fact alone, and independent of our earlier determination that the storm on August 15th was not of such a nature as to call into play the principle of "inevitable accident", we would have no recourse other than to find the Argonaut liable for the damage occasioned by its drifting.

19. "Q. Now, before you went into your room, Captain, did you give any orders to anyone about the ship with respect to standing by and watching her lines or her moorings? A. Not that I recall."

20. The Argonaut's log in detailing the steps taken in its mooring stated: "As there were no other dolphins or bollards in the vicinity the method of mooring taken was the only alternative."

21. "Q. Apparently from the notation which was made in the log, the fact that so many lines and cables were placed on

that cluster was reason enough for a good seaman to be concerned about the method of mooring at that point, isn't that true? A. That's true; in any instance where you have to place lines on one bollard or pile cluster or any type of mooring, if you overload it, it is not good practice, but in this instance there was no other alternative.

"Q. So that it would follow in your opinion, Captain, that this cluster was overloaded and showed it by pulling over? A. Yes, I believe the bollard (cluster) had too many lines on her."

However, the testimony further affirmatively establishes that Argonaut's contention that it had no other alternative in mooring is without valid basis.

The record abounds with testimony that other alternative methods of mooring were available and that the Argonaut's officers failed to utilize them, just as they failed to use an important additional mooring facility provided by the pier—a second wire cable (breast line).

Captain Pickering, a marine expert,[22] called by Hercules, testified the Argonaut was not moored in a seamanlike manner; that even in the absence of bollards, to which breast lines could have been run, they could have been made fast to the stringers or dock timbers.

Captain Ransome, another marine expert,[23] also called by Hercules, testified that "extra moorings" could and should have been put out by the Argonaut in view of the threatening heavy weather; that all the mooring should have been evened up and properly secured to withstand unusual wind; and that other patterns of mooring could have been employed by the vessel.

Captain Ransome differentiated between mooring a vessel for dock trials and mooring it against a storm. His testimony in this respect is significant since Argonaut contends in effect that the dock trial moorings having proved adequate earlier in the day, she was not required to take any further mooring steps, even in the face of the threatening storm. With respect to the foregoing Captain Ransome said:

"For a dock trial there is fore and aft springs to keep the ship from surging up and down the dock; to secure against a storm you put out lines from the direction that the storm is expected, not to hold the ship from running up and down the dock. That's the difference in the two."

Good seamanship required use of breast lines in addition to the spring lines to cope with storm conditions, Captain Ransome said. His testimony in that respect is particularly pertinent in view of the fact that a second breast line on the pier was not used either in the dock trials or thereafter.

Sheehan, the pier foreman testified to the presence of the unused breast wire; McComber, a marine diver who had worked in the vicinity for several years testified to the same effect and said that the presence of the second breast wire would be obvious to any person on the bridge of a ship looking down into the general area. On the score of the presence of the unused available breast wire Captain Donnelly testified that he was unaware of its existence; that he had made no inspection of the dock; that he had assumed command of the Argonaut as its Master only 36 hours before the accident and that he had only spent 12 hours aboard her at the time.

The second breast line, had it been used, would have afforded considerable additional protection to the ship's mooring. The storm came from the southwest; the wind therefore blew north against the port side of the Argonaut and its pressure was exerted for the most part against the single breast wire used; it was apparent that if this latter wire parted almost the entire pressure of the wind would be absorbed by the cluster piling and that is what actually happened, the cluster piling heeled over and the lines which had been run around the top of the cluster slid off causing the vessel to drift.[24]

The fact that the Argonaut was "light" (without cargo) at the time made it particularly susceptible to the force of the wind and its officers should have taken that fact into consideration under prevailing weather conditions.

Since Argonaut has impleaded Hercules on the ground that it was solely at fault and Hercules has counter-claimed and cross-

---

22. Captain Pickering is a consulting naval architect, marine engineer, surveyor.

23. Captain Ransome has held a master mariner's license for 20 years and has been employed as port captain in the New York area

24. Cf. Compress & Warehouse Co. v. United States, 4 Cir., 1951, 190 F.2d 699, 702. In that case the vessel was held liable because it put "* * * too much trust in one line where two or three could have and should have been used".

libeled, it is necessary to discuss, if only briefly, this phase of the litigation.

█ The testimony absolves Hercules of any liability for the drifting of the Argonaut. Such of its docking facilities as were used by Argonaut were soundly constructed and properly maintained. It was not its fault that Argonaut used only one of the two breast lines with which the pier was equipped, nor was it to blame for the failure of Argonaut to take such additional mooring action as was required under the circumstances.

Accordingly, we are of the opinion that the impleading petitions against Hercules should have been dismissed[25] and that it was entitled to judgment against Argonaut on its counter-claims and cross libels for the damages sustained to its pier because of Argonaut's negligence in mooring.

As to Libellants: neither Argonaut nor Hercules contend any fault on their part. There is no doubt of their right of recovery.

Finally, as to Argonaut, we are of the opinion for the reasons previously stated, that the District Court erred in its determination that (1) "The steamship Argonaut was moored in a seamanlike manner"[26] and (2) the incident was the result of an inevitable accident, and further erred in decreeing dismissal of Libellants' actions, and conclude accordingly that the Libellants were entitled to judgment against Argonaut.

As was said by the Supreme Court of the United States in The Louisiana, 1886, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85:

"The fact that the captain and the mate 'did not anticipate the breaking away of the vessel, and thought the lines sufficient to hold her,' may prove their want of judgment, but not that the 'accident was unavoidable' * * *."

In consonance with and pursuant to the above, we will affirm the judgment of dismissal by the District Court in its Consolidated Decree of Argonaut's impleading petitions[27] and its separate libel against Hercules[28] with costs to Hercules; vacate the judgment of dismissal of the four separate libels of the Libellants[29] and the counter-claims and cross-libels of Hercules therein[30] with costs to said Libellants and Hercules respectively; vacate the judgment of dismissal of the counter-claim and cross-libel of Hercules, with costs to Hercules in the separate action brought against it by Argonaut;[31] remand the four separate actions of the Libellants[32] with directions to determine the amount of their damages and to enter judgment accordingly against Argonaut with costs to the Libellants; and remand the counter-claim and cross-libel of Hercules in the action brought against it by Argonaut[33] and the counterclaims and cross-libels of Hercules in the four libels of the Libellants[34] with directions to determine the amount of Hercules' damages, and to enter judgments accordingly against Argonaut, with costs.[35]

McLAUGHLIN, Circuit Judge (dissenting).

The majority opinion concludes that the district court was clearly wrong in holding that "a case of inevitable accident had been

25. The District Court did dismiss the impleading petitions but that dismissal was premised on its over-all determination that the drifting was an "inevitable accident". It dismissed Hercules' counterclaims and cross-libels for the same reason.

26. Although in view of our disposition it is unnecessary to discuss it in detail, mention should be made of the error of the District Court in refusing to permit cross-examination directed to the question whether other vessels in the same vicinity had broken their moorings during the storm in question. It is clear that such cross-examination was proper in view of the defense of inevitable accident. The Louisiana, supra note 17; The William E. Reis, D.C.N.D.Ohio 1906. 143 F. 1013, 1017.

27. Nos. 10,824 to 10,827 inclusive.

28. No. 10,823.

29. Nos. 10,812 to 10,815 inclusive.

30. No. 10,811.

31. No. 10,811.

32. Nos. 10,812 to 10,815 inclusive.

33. No. 10,811.

34. No. 10,811.

35. The counter-claims and cross-libels of Hercules in the four actions of the Libel-

made out"; in its application of the principle of inevitable accident and in refusing to permit the Argonaut master to be asked, "Do you have any personal knowledge of any other vessels which broke adrift that afternoon of August 15, 1947, in that thunder storm?"

Taking up the last reason briefly, the trial court rightly disallowed the question because so many other elements would enter into this comparison and particularly because whether the captain heard of such occasions " * * * doesn't make any difference, there may have been 100 that he didn't hear about." In passing it is noted that libellants offered no proof by record or otherwise that no ships did so break adrift. But even more important, this reason is not included in libellants' points for reversal. It is used, as stated in their main brief, page 21, to " * * * merely point out * * *" the failure of appellees to produce evidence of damage to other craft in the storm. That position is fully confirmed on page 4 of appellants' reply brief.

Was the district court clearly wrong in holding the occurrence to be an inevitable accident?

That court stated the cause to have been "a sudden and terrific increase in the force of the wind which brought an entirely unforeseeable strain and stress on the dolphin and caused it to lay over. The center of the blow was localized in the vicinity of the ship and there was a sudden increase from 20 to 40 then to 60 miles an hour which certainly I do not think should have been foreseen by the master of the vessel because it wasn't foreseen by the weather observers who put out no storm warning." The vital testimony on the question of warning of the storm and of its nature was that of Parry, then head of the Weather Bureau's New York City station located at the Battery. His testimony has been inadvertently misconstrued. He never said, directly or in effect, that this particular storm "was a typical summer storm,— common for the locality and that the inci-

dence of a 60 mile-an-hour wind was not extraordinary." It will be remembered that the Argonaut was berthed at a Jersey City pier. As stated in appellants' brief *it was "moored in a protected slip in New York Harbor."* (Emphasis supplied.) Parry said the storm first appeared to be developing over New Jersey and moving eastward at 5:10 P.M. By 5:30 P.M. it was all over. It was slightly closer to the pier with which we are concerned than to the Battery. At the latter station at 5:00 o'clock the wind was south 17 miles, by 5:10 it was southwest 24 miles, at 5:11 it dropped to 20 miles. The next minute it jumped to 44 miles an hour and at 5:13, still on the Battery readings, "reached a velocity of 52 miles an hour." In August, 1947, Parry had had almost 45 years' Weather Bureau experience. In his opinion the maximum velocity of the wind at that time at the Jersey City piers " * * * *wouldn't be more than 60 miles an hour."* He described the storm as a cyclonic storm with a rotary movement similar to a hurricane. On cross examination the following assumption was put to him. "In other words, *this* storm you might say was common for this locality in the summer period?" The answer was not in agreement with the assumption but the qualified *"storms of this type, yes."* Parry, of all people, would hardly call that storm a common occurrence for New York Harbor. Summer thunder storms, yes, but not hurricane-like storms of gale velocity. Chief Mate Valentine of the Argonaut who had been on the ship all that day and was actually in the pier shop office when the storm broke said, "It was a very pleasant afternoon. The only indication of anything was the indication of a possible summer thunder shower."

On the question of notice of the "spot flash storm", as Captain Donnelly described it, Mr. Parry was asked, "I am not sure I understood; were there any storm warnings at the Battery of this thunder storm that hit New Jersey?" He answered, "There were no signals raised, no." Cap-

lants and the separate action of Argonaut against Hercules are duplicitous and intended to effect the single objective of re-

covery by Hercules from Argonaut for the damages sustained to the Hercules pier.

tain Donnelly on the Argonaut was directly across the harbor from the Battery station and confirmed this, saying, "There were no storm warnings or anything." The Daily Local Record of the Weather Bureau is in evidence. At the top of it appears the caption "Storm Warning Messages, Friday, August 15, 1947." There is an advisory warning at 0400 EST of a hurricane approaching the Mexican coast of Tampico and a later warning at 1000 EST. There is no warning whatsoever of the New Jersey storm. Parry did say that "in the regular forecast which the broadcasters over the radio issue to newspapers, and also in part of our daily weather bulletin we issued a forecast of thunder storms on the 14th and said for the 15th thunder storms by evening * * *." His recollection of the forecast was "Scattered thunder storms indicated." This, the notice relied upon by the majority, is no notice of a spot flash gale.

The uncontradicted evidence is that a freakish flash gale of about 60 miles per hour hit the Argonaut at approximately 5:13 P.M. August 15, 1947, with such force that the dock midship wire line snapped, the metal dock bollard, to which lines were attached, was broken in two and the cluster of piles, also bearing lines, pulled over almost to water level, with most substantial evidence present in the trial to the effect that the storm was extraordinary and unforeseeable. If the rule in the Albatross and Read cases means anything it means that the district court's finding of inevitable accident should not be disturbed.

The second proposition advanced by the majority is that the principle of inevitable accident was wrongly applied.

The district judge was alert to the governing law involved. He stated it at length in his oral decision at the conclusion of the trial. He squarely recognized that the Argonaut was presumptively at fault. He found, however, that she " * * * was moored *under the circumstances* in a seamanlike manner and * * * that the

dolphin to which its stern lines were attached was properly constructed * * *." (Emphasis supplied.)

Again, unless the trial court was clearly wrong in those findings they cannot properly be reversed.

True, Hercules used two experts who said the Argonaut was not moored in a seamanlike manner. One of these, Pickering, never saw the ship or the pier. The examination of Ransome, the other, was based on what he would do *"on the approach of* heavy weather" and he answered he would put out extra moorings *"so that it will withstand unusual wind."* His whole testimony was founded on a premise nonexistent in the facts of this matter—the forewarning of an "unusual wind."

As to the Argonaut defense, Captain Donnelly described the atmospheric conditions as an extraordinary storm; he had not seen such a storm aboard ship before. He had had a dock trial of the ship's engines that morning. All of the ship's lines had been doubled for that test and had remained that way. He had used the only available dock bollard. He was not told of, had not seen and never knew of a second supposed breast dock wire. He had no alternative but to put lines on the pile cluster. As to the question of whether there were too many lines on the pile cluster he said, "That depends on the condition of the pile cluster too." He knew nothing of the condition of the pilings under the water. He made no pretense of having had them examined by a diver or otherwise closely prior to the storm.[36] He said the ropes on the cluster were at the proper angle. He said it was not possible to have made the ship more fast. Without warning of the gale Donnelly was satisfied that it was safely moored. Had he known that the storm would be other than scattered thunder showers, unquestionably he and the owner would have had the opportunity of protecting the ship against an oncoming gale by changing its berth, by tug assistance, etc. Valentine, the first officer, corroborated

---

**36.** Captain Modave, the Farrell Lines port captain, said it was not the custom for the vessel operator to send for experts to see whether or not the berth is safe and strong in every way.

Captain Donnelly's testimony, particularly that there was no indication of an unusual storm that afternoon.

Regarding the Hercules pile cluster, the dock builder who erected it two years previously and the Jersey City engineer who had approved of its installation both testified to its sound, strong construction.

With the above evidence in the record the majority holds that the district judge was clearly wrong in finding that the Argonaut was moored in a seamanlike manner. To a large extent the majority conclusion is founded on the non-use by the Argonaut of a second breast line. That line is accepted as having been present and Captain Donnelly is blamed for not knowing of it. Hercules' chief fact witness, Sheehan, that company's pier foreman, said as to that second wire, *"It was anchored to underneath the dock, to the framework of the dock; it came up through the dock when you know the opening."* And though he knew only one wire was out he made no mention of the second wire to anybody on the Argonaut even when he saw the storm coming up. Donnelly, as has already been stated, never knew of its existence.

In the second reason the majority continues to state the Albatross, Read rule, then promptly casts it aside and sits as the nisi prius court. On this point also the district court judgment should be affirmed.