**ATLANTA–SCHIFFAHRTS G.m.b. H. and Hamburg-Amerika Linie, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 66–257.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 24, 1969.

J. Dwight LeBlanc, Jr., of Chaffe, McCall, Phillips, Burke, Toler & Sarpy, New Orleans, La., for plaintiffs.

Louis C. LaCour, U. S. Atty., New Orleans, La., Thomas J. Boyle, Dept. of Justice, Washington, D. C., for defendant.

George A. Frilot, III, and James H. Daigle, of Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for third-party defendant.

BOYLE, District Judge:

This suit in admiralty was instituted by Atlanta-Schiffahrts G.m.b. H. and Hamburg-Amerika Linie, as owner of the foreign flag vessel M/S CHRISTIANNA PIKURITZ, against the United States of America, as owner of the U. S. Army Derrick Barge BD–6654, to recover damages allegedly resulting from a collision in the Mississippi River between plaintiffs' vessel and the BD–6654 after said barge left her moorings during Hurricane Betsy on the night of September 9–10, 1965. The United States has impleaded New Orleans Stevedoring Company on the theory that a contract existing between the United States and the stevedores at the time of the collision made the stevedores legally responsible for the movements of the BD–6654. The case was tried on a former day and the Court, having considered the evidence, briefs of counsel and the applicable law, now makes the following:

## FINDINGS OF FACT

**1.**

At all material times, Atlanta-Schiffahrts G.m.b. H. and Hamburg-Amerika Linie, nationals of West Germany, were the owners and operators of the M/S CHRISTIANNA PIKURITZ.

**2.**

At all material times, the United States of America, a sovereign nation, was the owner of the United States Army Derrick Barge BD–6654, a public vessel of the United States, having the approximate dimensions of 140 feet in length, 72 feet in beam and 5 feet of freeboard and with a 100-ton crane derrick mounted thereon toward the after end.

**3.**

At all material times, New Orleans Stevedoring Company was a division of

James F. Flanagan Shipping Corporation, a Texas corporation doing business at New Orleans, Louisiana, and was performing stevedoring operations at the United States Army Terminal Gulf Outport in New Orleans, Louisiana, pursuant to a written contract with the United States of America.

**4.**

On September 9–10, 1965, the M/S CHRISTIANNA PIKURITZ was moored starboard side to, bow upstream, at the Press Street Wharf in New Orleans, Louisiana.

**5.**

On the morning of September 9, 1965, the BD–6654 was placed alongside the S/S GULF TRADER, a large ocean-going vessel, in order to assist in the loading of military equipment aboard the S/S GULF TRADER. The S/S GULF TRADER was moored at Berth No. 5 in the Army Terminal at the Port of New Orleans.

**6.**

The meteorological evidence introduced at trial indicates that as the day of September 9, 1965 progressed, the threat posed to the New Orleans area by Hurricane Betsy increased. By 1:00 p. m. CST, the United States Weather Bureau had posted hurricane warnings for the geographical area that includes New Orleans, although the exact landfall of Hurricane Betsy's center was still indefinite. Maximum winds at that time near the center of the hurricane were estimated to have been 120 to 140 miles per hour. From that time on, it was reasonably certain that the New Orleans area would experience severe weather conditions, if not the full impact of the storm, with the latter becoming more and more likely with each passing hour. Finally, at about midnight the eye of the storm reached the New Orleans area, bringing winds estimated as high as 150 miles per hour and causing a tidal surge, possibly as high as 14 feet, up the Mississippi River. Hurricane Betsy consti-

tuted a "vis major" if there ever was one.

**7.**

Prior to the time Hurricane Betsy actually reached the Port of New Orleans, but in anticipation of its arrival, the BD–6654 was moored outboard of the S/S GULF TRADER which was in turn moored to the dock as previously described. Although there was some variance in the testimony of the witnesses concerning the exact number and size of the cables and lines by which the BD–6654 was moored to the S/S GULF TRADER, a preponderance of the evidence reveals that there were approximately twenty lines, including four ⅞″ wires (two each at the bow and stern), five 1″ wires and eleven 6″ manila lines. In addition to these mooring lines, two heavy anchors were lowered from the bow or upstream end of the BD–6654. The evidence indicates that some of the mooring equipment utilized was new and that the remainder thereof was in good condition and evidence was presented concerning the strength of various lines used.

A preponderance of the evidence compels the factual conclusion that the BD–6654 was secured to the S/S GULF TRADER in such a manner so as to withstand all forces reasonably to be anticipated from Hurricane Betsy. This finding is supported by the opinions of every witness who viewed the mooring of the BD–6654 and, particularly, the opinion of Captain Melichar, Master of the S/S GULF TRADER, an unbiased witness of extensive maritime experience, who would be expected to inspect carefully the mooring of the BD–6654 in view of the risk that a barge improperly moored against S/S GULF TRADER would present to his vessel.

**8.**

As midnight approached, numerous vessels began to leave their moorings and drift upriver under the influence of the wind and the upstream surge of the tide and, in view of the hazard present-

ed by this turn of events, the crew of the BD–6654 were taken aboard the S/S GULF TRADER. They left floodlights on the BD–6654 burning brightly.

## 9.

At approximately 12:30 a.m. on September 10, 1965, the S/S GULF TRADER was struck on the stern by an unidentified drifting barge. This drifting barge, being driven upstream by the force of the storm (as were many other vessels), glanced off the S/S GULF TRADER (probably due to the extreme weight of the oceangoing S/S GULF TRADER) and struck the stern of the BD–6654, causing the lines connecting the BD–6654 to the S/S GULF TRADER successively to part and the BD–6654 to go adrift. When last seen by her crew the BD–6654 was proceeding upstream with her lights burning brightly.

## 10.

Minutes after being wrenched from her moorings, the BD–6654, still moving upstream, struck the stern of the M/S CHRISTIANNA PIKURITZ, inflicting the damage for which recovery is herein sought.

## 11.

The sole proximate cause of the BD–6654 going adrift and subsequently colliding with the M/S CHRISTIANNA PIKURITZ was the striking of the BD–6654 by the unidentified drifting barge. The evidence establishes that had not the BD–6654 been struck by the barge which struck her or by some other vessel, she would have in all reasonable probability remained moored alongside the S/S GULF TRADER.

## 12.

That the BD–6654 would be wrenched from her mooring, not by the direct forces of the storm (which could be reasonably anticipated and prepared for), but by being struck from the stern by one of the numerous vessels which had left their moorings and drifted upriver, was not a reasonably foreseeable occurrence. The evidence does not reveal that any weather information was promulgated warning against even the possibility that tidal surges would occur in the Mississippi River many miles upstream from its mouth causing numerous vessels to leave their moorings and be carried upriver. Such an occurrence was, so far as the evidence reveals, unprecedented in this area under previous hurricane conditions.

## 13.

Indeed, had the unidentified drifting barge not struck the BD–6654, the evidence shows that it would have been struck by another vessel (S/S WAKE FOREST VICTORY) drifting upstream shortly thereafter. In fact, the M/S CHRISTIANNA PIKURITZ, itself, was later struck by the drifting S/S WAKE FOREST VICTORY.

## 14.

In view of the foregoing findings of fact and the conclusions of law which will follow, it is unnecessary for the Court to make any specific findings with respect to the plaintiffs' charge that the BD–6654 should have been moved to the Chalmette Slip in advance of the storm. Likewise, it is unnecessary for the Court to make any findings relative to the alleged dealings between the United States and New Orleans Stevedores with respect to the possibility of removing the BD–6654 to another location. Rather, the factual finding that the BD–6654 would have remained at her mooring alongside the S/S GULF TRADER, but for the fact that it was unforeseeably struck from the stern by a drifting vessel, is determinative of the issue of liability in this case and renders the third-party claim against New Orleans Stevedoring Company moot.

## CONCLUSIONS OF LAW

### 1.

The Court has jurisdiction of the parties and of the subject matter of this cause and venue is properly laid in the

Eastern District of Louisiana. The cause falls within the admiralty jurisdiction of this Court and the United States of America is properly sued under the "Public Vessels Act," 46 U.S.C. §§ 781–790.

**2.**

■ In this suit by a foreign national, the Court is satisfied that the government of which plaintiffs are nationals (West Germany) allows nationals of the United States to sue in its courts under similar circumstances. Therefore, the special jurisdictional requisites of 46 U.S.C. § 785 have been met.

**3.**

This case is controlled by legal principles firmly established in the maritime law. These principles are excellently summarized in Trawler JEANNE D'ARC, Inc. v. Casco Trawlers, Inc., 260 F.Supp. 124 (D.Me.1966), as follows:

"* * * When a collision is caused by a vessel drifting from her moorings, there is a presumption of fault on her part, and 'she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a *vis major,* which human skill and precaution, and a proper display of nautical skill could not have prevented.' The Louisiana, 70 U.S. (3 Wall.) 164, 173, 18 L.Ed. 85 (1866); Patapsco Scrap Corp. v. Maryland Shipbuilding & Drydock Co., 268 F.2d 817, 819 (4th Cir. 1959); Swenson v. The Argonaut, 204 F.2d 636, 640 (3d Cir. 1953); The President Madison, 91 F.2d 835, 837 (9th Cir. 1937). It is well settled that the burden of proving inevitable accident is 'heavily' upon the party asserting that defense: Boudoin v. J. Ray McDermott & Co., 281 F.2d 81, 88 (5th Cir. 1960); The Lackawanna, 210 F. 262, 264 (2d Cir. 1913); that a finding of inevitable accident is 'not to be lightly arrived at,' The Bayonne, 213 F. 216, 217 (2d Cir. 1914); Palmer v. City of New York, 43 F.Supp.

43 (S.D. N.Y. 1942); and that the party asserting the defense must affirmatively establish that the accident 'could not have been prevented by the use of that degree of reasonable care and attention which the situation demanded * * *.' Swenson v. The Argonaut, supra, 204 F.2d at 640: The Rob, 122 F.2d 312, 313 (2d Cir. 1941). With particular reference to the defense of inevitable accident as the result of high winds, Griffin, The American Law of Collision § 241, at 544 (1949) states:

When collision is due to the force of the wind in parting the lines of moored or anchored vessels or in causing them to drag, the defense is allowed only if it appears (a) that the force of the wind was *not* to have been anticipated; (b) that the vessel had been moored or anchored in such a way as to be prepared to withstand any winds reasonably to have been expected; (c) that there was no negligence on the part of those in charge of her."

**4.**

The burden of proof resting upon a defendant asserting the defense of "vis major" is well expressed in the following excerpt from United States v. Barge CBC 603, 233 F.Supp. 85 (E.D.La., 1964):

"* * * In addition to showing the presence of a 'force majeure', one who asserts this defense also has the burden of clearly establishing his freedom from fault before he can be exonerated from payment for damages to the property of an innocent third party. Sherwood Refining Co., Inc. v. Whiteman, 127 F.Supp. 478 (E.D.La.1955). In such a case, freedom from fault is generally determined by the reasonableness of the precautions taken under the circumstances as known *or reasonably to be anticipated.* Swenson v. The Argonaut, 204 F.2d 636 (3 Cir.1953); see also Gilmore and Black, The Law of Admiralty (3rd Ed.1957) at p. 398.

786

"It is thus incumbent upon respondent in this case to show that the accident could not have been prevented even by the use of that degree of reasonable care and attention which the situation demanded. Moran Towing & Transportation Co. v. M/S Hoperange, 226 F.Supp. 1018 (E.D.La.1964); Boudoin v. J. Ray McDermott and Co., 281 F.2d 81 (5th Cir.1960); The J. N. Gilbert, 222 F. 37, 41 (5th Cir.1915)."

5.

■ Applying the above-stated principles to the facts of the instant case, the record clearly establishes that the BD–6654 was securely moored alongside the S/S GULF TRADER in such manner as to withstand all forces reasonably to be anticipated from Hurricane Betsy and that in all probability she would have remained safely moored had she not been struck by a drifting vessel. Under these circumstances, the precautions taken in the mooring of the BD–6654 met the standard of nautical skill demanded by the maritime law and the defendant, therefore, was guilty of no negligence in that regard. See Massman-Drake v. Towboat M/V HUGH C. BLASKE, 289 F.Supp. 700 (E.D.La., 1968).

6.

■ The record cannot support a contention that among the circumstances reasonably to be anticipated by those in charge of the BD–6654 was the possibility that numerous vessels would leave their moorings and be propelled upstream by an unprecedented tidal surge and, in turn, strike other moored vessels. See Massman-Drake v. Towboat M/V HUGH C. BLASKE, supra.

7.

■ The failure to remove the BD–6654 to another location, assuming, but not deciding that another location would have been safer, cannot be equated with negligence under the circumstances of this case. The law required only that the BD–6654 be moored in such fashion that it could withstand those forces reasonably to be anticipated and the Court has found that the BD–6654 was so moored. The fact that hindsight might later reveal that the BD–6654 could have been more safely moored at another location, in that she would not there have been as readily exposed to an unforeseeable danger, namely striking by a vessel drifting upstream, cannot be construed as fault when those responsible for the BD–6654 did in fact exercise that degree of nautical skill required by law in mooring the vessel where she stood. The law does not demand infallible judgment, but only that reasonable precautions be taken in light of the circumstances which were either actually anticipated or were reasonably to have been anticipated. Since the drifting upstream of numerous vessels on the night of Hurricane Betsy was an unforeseeable occurrence, it must necessarily follow that failure to remove the barge to another location presented no foreseeable risk of being struck by a drifting vessel and, therefore, does not constitute negligence.

8.

The sole proximate cause of the BD–6654 breaking adrift and colliding with the M/S CHRISTIANNA PIKURITZ was the striking of the BD–6654 by the unidentified drifting barge, a circumstance over which defendant had no control and one brought about by the negligence of those in charge of the unidentified drifting vessel and/or the "vis major," Hurricane Betsy.

9.

Accordingly, judgment should be entered in favor of the defendant, United States of America, and against the plaintiffs, Atlanta-Schiffahrts G.m.b. H. and Hamburg-Amerika Linie, dismissing this suit at plaintiffs' costs. Likewise, judgment should be entered in favor of the third-party defendant, New Orleans Stevedoring Company, and against the third-party plaintiff, United States of America, dismissing the third-party complaint.