## THE MENDOCINO.

District Court, E. D. Louisiana. October 7, 1929.

No. 18880.

Pillans, Cowley & Gresham, of Mobile, Ala., and Denegre, Leovy & Chaffe, of New Orleans, La., for libelant.

J. D., M. A. & E. H. Grace, of New Orleans, La., for respondent.

BORAH, District Judge. This case involves a collision between the steamship Lake Fairport, belonging to the Mobile, Miami & Gulf Steamship Company, Inc., and the steamship Mendocino, belonging to Wilh. Wilhelmsen of Tonsberg, Norway. The collision occurred during the morning of April 1, 1927, in New Orleans Harbor. The Lake Fairport was moored at the wharf of the American Sugar Refining Company with her head upstream discharging cargo. She had a head line made up of three parts running from a port chock on her bow across her head to the wharf; a breast and spring line leading from the starboard bow to the wharf; and also three lines aft. Immediately astern of the Lake Fairport, at a distance not exceeding 25 feet, was moored another vessel. Upstream on the same or easterly bank of the river there were no ships moored within her immediate vicinity, nor was there at the time of the collision any ship maneuvering outboard of her other than the Mendocino.

The Mendocino is a tank steamer, 425 feet between perpendiculars. Prior to the collision she had been at anchor under Algiers point approximately 850 feet above the wharf at which the Lake Fairport was moored and across the river therefrom. The river at this point has an estimated width of 2,000 feet, and the Mendocino when at anchorage was 200 feet from the west bank.

On April 1, 1927, at 7:45 a. m., the river pilot came on board the Mendocino and signaled "stand by" to the engine room. The weather was clear, a fresh breeze was blowing out of the southwest, and a four or five mile current was running in the river. Having a clear field of maneuver, and conditions being otherwise favorable for taking the vessel from her anchorage and bringing her around and heading downstream for her voyage to sea, her anchors were weighed, and at 8:05 a. m., according to the log of the Mendocino, slow speed ahead was given on the engine in order to maneuver the ship around. Further entries show that the engine was running at half speed ahead from 8:07 and at full speed ahead from 8:08 a. m. At 8:10 a. m. full speed astern was rung to the engine room and both anchors were dropped in an effort to stop her speed. The Mendocino drifted down the river out of control and over towards the east bank and struck her bow against the wharf at an angle of about 45 degrees and at a point a short distance above the Lake Fairport. She then drifted against the mooring lines of the Lake Fairport, parting the line which ran from her port bow to the wharf, eased in, and collided with the steamer's starboard anchor and her bow, from whence she fell off, maneuvered out in the river again, and anchored at 8:37 a. m.

After the collision a survey of the damage to the Lake Fairport was held, and subsequently her owners were notified in writing by the marine surveyor representing the Mendocino that:

"The Norwegian Steamer Mendocino authorized me guarantee payment for repairs on Steamer Fairport as per survey held at New Orleans April 1st, 1927.

"I beg to say that you have the damage repaired and that we will take care of any just and legitimate expenses incurred."

In the libel the Mobile, Miami & Gulf Steamship Company sues to recover for damages caused the Lake Fairport by the collision, and for answer claimants plead inevitable accident in so far as the uncontrolled movements of their vessel is concerned, and assert that the proximate cause of the damage sustained by the Lake Fairport was the failure on her part to slacken her lines and drop her starboard anchor when those on board saw the Mendocino approaching. Claimants deny that the letter hereinabove recited constitutes an admission of liability on their part, and contends that same only expressed a willingness to pay within certain limitations, and inasmuch as their offer to amicably adjust the matter was not accepted same was withdrawn, and in consequence the letter is of no force or effect in respect to libelant's demand.

The question which arises at the outset is whether the Lake Fairport was at fault for the collision. It will serve no useful purpose to rehearse the evidence regarding the question whether the Lake Fairport was properly moored alongside the wharf. I am satisfied that her lines were run in a seamanlike manner and that she was properly moored at a place where she had a perfect right to be. I am also convinced that the Lake Fairport was not at fault for failing to slacken her lines, because a collision was not imminent up to the time of the actual impact and could not fairly have been anticipated. My conclusion in this respect is based on the testimony of the pilot of the Mendocino and the third officer and boatswain of the Lake Fairport. They were stationed on the bridge and forecastle head of their respective vessels, and were in a better position than any one else to observe the maneuverings of the Mendocino. In their opinion it did not appear probable or possible that there would be a collision between these vessels. But it is said that the Lake Fairport was guilty of negligence which contributed to the cause of action, in that she carried her inboard patent anchor at her hawse-pipe in violation of a local port regulation. This port regulation, the existence and validity of which is questioned, was adopted November 17, 1897, by the Board of Commissioners of the Port of New Orleans, and reads as follows:

"2nd: All seagoing vessels coming to the levee must have their yards braced up sharp by the starboard braces, their starboard anchor on the forecastle, and their port anchor cocked billed, or at the hawse ready to let go. Boats, bumpkins and davits to be rigged inboard."

"12th: Vessels landing at wharves on the west bank will reverse the rule applying to yards and anchors."

It is apparent from a reading thereof that this rule is wholly irrelevant; the issue being not whether libelant should recover for the damage to the hawse-pipe, which is only one of the items of damage involved, but whether the fault of the collision is imputable to claimant's vessel. Furthermore, libelant's vessel does not come within the purview of the rule, for the same has reference to "vessels coming to the levee," and the duty imposed thereunder is to the levee and not to vessels drifting down the river out of control. Again, it is manifest that the rule refers to stock anchors which when housed are on the forecastle and not at the hawse as a patent anchor. Apart from this it appears from the record that the rule is now obsolete and no longer in force.

With these questions eliminated from the field of discussion, it is in order to consider the law and the evidence bearing on the defense of inevitable accident. Having in mind the fact that this collision occurred in broad daylight between a vessel moored in a lawful place discharging cargo and a moving vessel having unobstructed and ample room for maneuver, it is well to consider the presumptions that arise under such circumstances. The Gulf of Mexico (C. C. A.) 281 Fed. 79; The Oregon, 158 U. S. 203, 15 Sup. Ct. 804, 39 L. Ed. 943; The City of New York, 147 U. S. 72, 85, 13 S. Ct. 211, 37 L. Ed. 84. When a moving vessel runs into a vessel anchored or moored in a lawful place, the presumptions are all against the moving vessel, and she is presumed to be at fault unless she exonerates herself. The presumptions against her are strong. Practically, her only defense is vis major or inevitable accident. The Gulf of Mexico (C. C. A.) 281 Fed. 79; The Oregon, 158 U. S. 203, 15 Sup. Ct. 804, 39 L. Ed. 943; The City of New York, 147 U. S. 72, 85, 13 S. Ct. 211, 37 L. Ed. 84. The defense here is inevitable accident, and this defense will not avail the Mendocino unless she is shown to be free from fault. Nor can the defense be maintained if she voluntarily put herself in a situation where she receives the effect of natural forces, the result of which should have been foreseen and might reasonably

have been anticipated. Spencer Marine Collisions, § 195. See Marsden's Collisions at Sea (8th Ed.) p. 18, par. 2.

█ From the above considerations it is clear that the burden is on the Mendocino to show "affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution, and a proper display of nautical skill could not have prevented." The Louisiana, 3 Wall. 164, 173, 18 L. Ed. 85.

The evidence for the Mendocino was in substance that she was being brought around to head downstream and was coming around nicely on her course until headed almost directly downstream when, as the pilot testified, a terrific gust of wind came up suddenly out of the southwest and forced her bow to the city or east side of the river. The pilot also stated that he knew the force of the current before he started to maneuver the vessel, and in his opinion it was the gust of wind that proximately caused the collision.

The master of the Mendocino says: "After hoisting up the anchors and getting under way we had a bad squall, wind, and as the current too was unusually strong she was drifting sidewise up against the bank on the other side."

According to the second officer, there was a heavy current and strong wind which swung the ship sideways downstream.

The third officer swore that the weather conditions were the same at the time of the collision as they were when the day opened and that these conditions existed to the same extent at 11:30 a. m. when the vessel, without trouble of any kind, finally rounded to and proceeded to sea. In his judgment a strong wind and a strong current were responsible for the collision, and these conditions were known before the vessel hove up anchor.

The remaining witness to testify for the Mendocino was the carpenter. He explained the cause of the collision in this language: "She drifted and drifted to the other side, the current took her."

The log of the Mendocino which was offered in evidence makes no mention of a bad squall or terrific or sudden gust of wind nor does claimant's answer, which is verified upon information furnished by officers of the Mendocino, set forth that the collision was caused or contributed to by the wind.

As against this, the master of the Lake Fairport testified that on the day in question the weather was fair and hot with no rain and hardly any wind. He was, however, in the city proper at the time of the collision and knew nothing of the weather conditions that existed on the river.

The third officer stated: "I noticed that the Mendocino was trying to round up coming down broadside, and owing to the conditions of the river I took particular notice of how she was going to round to." This witness in his entire testimony does not mention the wind as being a factor that contributed to the collision, and this is equally true of the boatswain who likewise testified for the Lake Fairport.

From this brief analysis of the testimony it will be observed that the pilot and master of the Mendocino are the only witnesses that mention a terrific gust or bad squall. Others have testified that there was a strong wind, but no witness has stated that such an occurrence was unusual or could not have been forseen or reasonably anticipated.

█ It is a matter of common knowledge, of which this court will take judicial cognizance, that violent squalls are frequent in and about this harbor in the early spring. Wind of great force is to be anticipated in this navigation, and in my opinion the wind that struck the Mendocino on the occasion in question, while strong, did not exceed in violence any that might be reasonably expected in this locality. The Louisiana, supra.

Under such circumstances, the inquiry need proceed no further, as the court is not called upon to inquire wherein the Mendocino was not managed with proper nautical skill, though the testimony in the case would well justify the conclusion that this collision might have been averted if the swinging maneuver had been accomplished by backing and filling or even by rounding to under slow orders on the engine. The Granite State, 3 Wall. 310, 18 L. Ed. 179.

I am of the opinion, therefore, that the steamship Mendocino is wholly at fault for the collision, and a decree may be entered so declaring.