## JONES & LAUGHLIN STEEL CORPORATION v. VANG et al.

No. 5466.

Circuit Court of Appeals, Third Circuit.

Sept. 27, 1934.

Duncan, Leckie, McCreary, Schlitz & Hinslea, of Cleveland, Ohio, and William D. Evans, of Pittsburgh, Pa., for appellant.

Blaxter & O'Neill, of Pittsburgh, Pa., and Lewis, Adler & Laws, of Philadelphia, Pa.

(Otto Wolff, Jr., of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

Receivers of Iron City Sand & Gravel Company and sundry persons and corporations filed in the District Court of the United States for the Western District of Pennsylvania a libel in personam against the Jones & Laughlin Steel Corporation seeking damages for injuries to their marine properties occasioned by the alleged negligence of the respondent in handling a barge and allowing her to break away and drift downstream. The respondent by answer denied liability and by petition prayed that, if liable, its liability be limited to the barge and her pending freight. From an interlocutory decree holding it at fault and denying limitation of liability, the respondent steel corporation appealed.

The story of the case as told by the undisputed facts is briefly as follows:

The respondent purchased coal from the Vesta Coal Company under a contract which called for delivery in barges at its South Side plant on the Monongahela river in the city of Pittsburgh. The coal company loaded its barges with coal at its mines upstream, caused them to be towed in flotillas downstream by a river steamer, made deliveries by leaving barges singly or in groups with the respondent's fleet at its plant, there to be manned, supplied with lines, moved and unloaded by the respondent how and when it chose.

On March 11, 1933, the coal company's steamer placed Barge 608, laden with coal, in the respondent's fleet of barges at its South Side plant. In consequence of heavy rains in the region upstream, the Monongahela river had on that day (as shown by river gauges read at eight o'clock in the morning) begun to rise at Pittsburgh. It was about four feet above normal. Readings at the same time on March 12 showed a rescission of about a foot and on March 13 of a few inches. Early in the morning of March 13, a heavy rain, amounting almost to a cloudburst in the upper reaches of the river, set in and continued most of the day, so that on the morning of March 14 the river gauges at Pittsburgh showed 20.01 feet, a rise of 6 feet during the preceding twenty-four hours. On that day there was a further rise of 3.3 feet. During the thirteenth and fourteenth the rise of water up the river, with which rivermen at Pitts-

burgh keep themselves posted, was even more marked.

The barge in question was a steel craft, square-ended, without a deck, 208 feet in length, 26 feet beam and 9 feet in depth, laden with nine hundred tons of coal. In the afternoon of March 13 she was warped out of her position in the fleet and placed in a slip beneath a coal hoist (astride the slip) for the purpose of unloading. The slip is a waterway in the river, a little wider than the beam of the barge, made between work-barges lashed to piers supporting one end of the coal hoist ashore and a work-barge and a flat-barge made fast to a pier supporting the other end of the coal hoist in the stream. As only about seventy-five tons of coal had been removed that afternoon, the barge was left in the slip over-night. On the morning of the fourteenth, however, the men in charge of the fleet, observing the greatly increased rise in the river, set about to make everything fast. They ran lines from the abutments and across the barges tying them together. Finally they had everything secure. The barge in question was still in the slip. No more of her cargo had been hoisted.

On returning from lunch shortly after noon, the respondent's men at the landing observed that a gorge, comprising an accumulation of river drift, logs, trees, posts and brush, had formed in the slip against the upstream end of the barge, that it had "jammed solid," and had reached such proportions both as to solidity and area that it was deemed necessary for the protection of the rest of the fleet to afford it an outlet by moving the barge from the slip, "digging out the drift", and letting the current carry it away. It was, however, not until about three o'clock that the work of shifting the barge was actually begun. By means of cables on the shore barges, operated by electric winches, the barge in question was pulled downstream away from the gorge about 50 feet, which was as far as the length of the cables would permit. The gorge held fast. The cables were then cast off and three hemp lines from the work-barge and flat-barge on the opposite side were made fast to her, the intention being, while the three hemp lines were being slacked out by hand, to let the current carry the barge some 80 feet farther downstream and away from the gorge until she had reached a point where she could be breasted into the fleet at a position made vacant for her. At the moment the second operation (that of slacking out the hand lines) was begun, the drift which had accumulated at the head of the slip suddenly

broke, and was carried through the fifty feet of open water to the barge with such force that when it struck her it caused the first of the three lines to break, the second line to break the mooring post to which it was secured, and the third to slip off the mooring post to which it had been fastened. The barge, with no one aboard, and being then out of control and still heavily laden, was carried away on the swift current of the swollen water downstream where it swept into the fleet of the Iron City Sand & Gravel Company, tore away the lashings of a number of barges and other flotilla which in turn spread upon the river, drifted at random and inflicted damage to the craft of still another fleet farther down.

Out of these facts three issues arose:

(a) Whether or not the respondent, through its servants, was negligent or at fault in moving the barge in the manner and at the time it did; (b) whether or not the respondent held the barge as bailee or under charter and, according to a finding of bailment or charter, (c) whether liability for negligence, if negligence be found, is for all damages or for damages limited to the value of the barge and her pending freight.

These issues bring into view the disputed facts of the case which are many.

■ (a) On the issue of negligence or fault, the testimony is directed first to a question whether the respondent's servants acted as good rivermen—that is, men on the Monongahela river at Pittsburgh conversant with the habits of that waterway when swollen by heavy rains and with the hazards to craft upon its surface—in lashing the barges to one another by cross lines and leaving the barge in question in the slip on the morning of March 14. It seems to us this is not an important question, at least not the decisive one, for assuming, as some of the testimony indicates, that this was good watermanship, the question of fault centers in what was done afterward when, having made the fleet snug, the men changed their minds when later in the day the gorge formed at the head of the barge in the slip. Knowing the river and knowing that currents in that stretch set drift on swollen waters in the direction of the slip, they were bound to anticipate drift, which apparently they did, for they prepared for it by lashing the fleet. But when the drift solidified into a gorge at the head of the slip, the men saw it, walked upon it, and were bound within reason to anticipate its behavior if relieved of the support of the barge which was held in the slip by moorings. They

knew that the drift was working under the barge and raising her at that end, and that in consequence the pressure was not static but active. Whether it was necessary to withdraw the barge, break the gorge and let the drift through is uncertain; but there is no uncertainty that once embarked upon the undertaking the men were required to do it with skill commensurate with the hazards. When they decided to drop the barge back by hand, they had to anticipate what would happen to her if the gorge broke, and whether the hand lines would hold her. They made a guess as to the behavior of the gorge. They thought it would hold after the removal of the barge, and that they would have to dig it out before it would start. In other words, they trusted the gorge to hold itself in place. In this they were wrong for it broke and swept down upon the barge. In such an eventuality they trusted to the three hemp lines. In this, too, they were wrong, for on the impact of the drift upon the barge the lines failed. The presence of a tug or river steamer would have saved the situation from disaster but none was provided. Clearly the miscalculated action of the gorge was not an "inevitable accident" or a "vis major." The Louisiana, 70 U. S. (3 Wall.) 164, 18 L. Ed. 85; The Olympia (C. C. A.) 61 F. 120; The New York (D. C.) 93 F. 495, 497; The Lackawanna (D. C.) 210 F. 262; The Bayonne (C. C. A.) 213 F. 216; The Forde (C. C. A.) 262 F. 127; Petition of Diamond Coal & Coke Co. (D. C.) 297 F. 242, affirmed (C. C. A.) 297 F. 246; The Mendocino (D. C.) 34 F.(2d) 783. Breaking of the gorge when relieved of support by the barge obviously was a thing that might happen and, accordingly, should have been anticipated. To this, some experienced rivermen testified. When, considering these risks, the men still determined to remove the barge, nautical knowledge and skill called for provision, presently available, to withstand the impact of the drift upon the barge or, failing that, provision by the presence of steam craft quickly to make fast to the barge on the first sign of her breaking away. To this, also, rivermen testified. As no such care was exercised in the face of grave nautical possibilities, we find the respondent at fault in taking a chance on the action of the gorge and in handling the barge and allowing her to break away and, accordingly, we find it liable for damages.

(b) The extent of the respondent's liability for damages depends on its relation to the barge, whether it was that of bailee or charterer. The respondent says it was charterer of the craft. The court found it bailee.

The reason of the respondent's insistence that it was charterer is its desire to resort to the Limited Liability Act (section 4286, R. S. [46 USCA § 186]) which provides that: "The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels. * * * *"

Thus it devolved upon the respondent to prove a charter. This it undertook to do by two lines of evidence: One, that it did "man, victual, and navigate" the barge in the waters about its plant, and, interpreting the word "victual" as not in every case meaning food but including "supplies" such as tackle, was within the statute. This was error. The expression "man, victual, and navigate" is descriptive of the kind of "charterer" who shall be deemed "owner" and be entitled to limitation of liability. It presupposes a charter— "The *charterer* of any vessel, in case he shall man, victual, and navigate *such* vessel (that is, the vessel chartered) * * * shall be deemed the owner." The fact that one possessing a vessel has done these three things does not prove that he is a charterer. That remains to be proved by other evidence; then, when proved, evidence of the triple acts becomes necessary to make effective and obtain the privileges and immunities of the statute.

The other line of evidence to which the respondent resorted to prove a charter as a fact is substantially as follows:

For a long period there existed between the Vesta Coal Company and the respondent a contract (whether originally written we do not know yet orally renewed and amended from time to time) for the purchase and delivery of coal at its plant at South Side, Pittsburgh. It covered, according to the oral testimony, the price "for coal, for transportation and for barge service." This price was in two figures: One for coal and the other for "transportation and barge service." The expression in respect to the price "for coal, for transportation" is self explanatory. The expression in respect to the price for "barge service" is explained to be "the use of the barge while the coal is in the landing; being held for storage purposes," the steel corporation "remaining responsible for the barges."

Pursuant to this understanding, it was testified, the respondent, which had no yards for the storage of coal, was at liberty to hold the loaded barges in its fleet as long as it wished, sometimes a few days, sometimes a few weeks and perhaps six months. The contract, so far, as the testimony discloses, contained no prescribed time for unloading and no provision for return of the unloaded barges to the coal company. This is the contract which the respondent says is a charter party.

 A charter party is a specific and, we venture to say, an express contract by which the owner lets a vessel or some particular part thereof to another person for a specified time or use. 58 C. J. 106; Ward v. Thompson, 63 U. S. 330, 16 L. Ed. 249; The Harvey and Henry (C. C. A.) 86 F. 656. A diligent search has failed to uncover any law on a charter party by implication. All the law available to us deals with a charter party as an express contract, whether written or oral. Benedict's Admiralty (4th Ed.) § 200. Being an express contract it must be proved yet may be construed like any other contract. Declining to find a charter by implication we are asked to construe the coal contract as a charter party. 24 R. C. L. pp. 1093, 1097. That contract does not mention the charter of the barges nor does it purport to be a charter party. The only words in the contract touching barges are "barge service." It is difficult to construe these words as a demise or otherwise a chartering of vessels with the rights and liabilities of the owner shifting to another. Had the coal company intended to demise its barges and the respondent intended to charter them, they would have expressed their intention in plain words. Failing to do so, we cannot put ourselves in their place and say they intended something they did not express. The situation which the parties developed by the use of the words in their coal contract is entirely consistent with one of bailment. While the expression "barge service" as interpreted by the witnesses gave the respondent the right to hold and unload the barges at its pleasure, we cannot, in the absence of intention of the parties, mutually arrived at and plainly expressed, discover a demise or even a lesser chartering of the craft within the sense of the admiralty law. Proof of storage service and of storage use is not proof of a contract of charter. Rather, it is proof of bailment. A contract of charter is, in the respondent's case, an independent legal fact which it must prove. Indeed, as we read the record, there is no evidence of actual charter and no indication that the par-

ties ever intended one. We find, in accord with the learned trial court, the relation of the respondent to the offending barge was not that of charterer but was that of bailee.

(c) Failing proof of a charter, we find the respondent has not brought itself within the privileges and immunities of the Limited Liability Act. It follows on our finding of bailment that the respondent is broadly liable for the damages occasioned by the negligence of its servants in respect to the barge in question.

The decree below is affirmed.