**478**

SHERWOOD REFINING COMPANY,
Inc., Libelant,

v.

George W. WHITEMAN and the Barge
U. S. 141, her engines, boilers, tackle,
etc., Respondent.

No. 2304.

United States District Court,
E. D. Louisiana, New Orleans Division.

Jan. 7, 1955.

Terriberry, Young, Rault & Carroll,
Walter Carroll, Jr., New Orleans, La., for
libelant.

Lemle & Kelleher, George B. Matthews, New Orleans, La., for respondent.

WRIGHT, District Judge.

On the early morning of April 4, 1952,
during a storm, respondent's barge, U. S.
141, broke its mooring lines and collided
with libelant's dock, located near Gretna,
Louisiana. Respondent seeks to avoid
liability for the damage on the ground
of inevitable accident or Act of God.

Respondent was at the time in question engaged in the towing business and
in connection therewith maintained two
landings on the west bank of the Mississippi River known as the Whiteman Upper and Lower Landings, the upper landing being several hundred feet upstream
from the lower. The barge U. S. 141
was moored against the levee at the upper landing. It measured 225 feet in
length, 51 feet in width, and 18 feet in
depth. A large steel "A" frame approximately 85 feet in height with legs four to
five feet in width stood on, but was unsecured to, the deck of the barge. Also
aboard the barge unsecured to the deck
was the housing cut from a sunken tug.

There is considerable question as to
how the U. S. 141 was moored at the

time of the storm. With parrot-like precision, respondent's witnesses testified that it had a 1½" steel cable from its stern to a dead man on the levee, forward and aft breast lines consisting of ⅞" and 1" steel cables secured to another dead man on the levee, 1¼" steel cable from the forward end of the barge to still another dead man on the levee, and a 1¾" marlin wrapped cable from the forward end of the barge secured to a sunken tug hull upstream. In addition, an anchor affixed to a 2½" anchor chain was run from the forward center bits of the barge upstream. It is respondent's contention, supported by the testimony of his witnesses, that all of these cables parted in the storm save the stern line, on which the barge swung around and came in contact with libelant's dock some 200 feet downstream. It appears, however, that respondent, on the day of the storm, advised libelant's dock superintendent that the U. S. 141 had been moored with only three lines, two of which parted in the storm.

The uncontradicted testimony shows that two feet upstream from the U. S. 141 were two empty cargo barges each moored to the bank with two ordinary 1" Manila lines, none of which parted during the storm. In addition, at Whiteman's Lower Landing, there were some 15 barges, not one of which lost a line during the storm. Libelant's dock escaped damage in spite of the fact that it was equipped, as the photographs show, with a large, raised, flat sign approximately 20 feet long and 10 feet wide. A small canvas covered launch, lying at libelant's dock, also was left untouched.

There was no prior warning of the storm published by the Weather Bureau. The Weather Bureau summary issued subsequently indicates that a line squall struck the general area in question and did considerable damage to the Huey P. Long Bridge across the Mississippi River, to a radio tower and to a railroad terminal wharf in Westwego, several miles upriver from Gretna. The report indicates that there was a roll cloud at 100 to 200 feet and that the anemometer on the river bridge, 269 feet above ground, recorded a wind of 90 miles per hour. The report further showed that the entire storm was over in a short space of ten minutes.

A weather expert produced by respondent, disagreeing to some extent with the Weather Bureau in his estimate of the severity of the storm and referring to it as a tornado, testified that although the wind was from offshore, that is, against the levee to which the U. S. 141 was moored, the pressure of the wind on the barge would have been from the levee since tornadic winds move in a counterclockwise motion. He also suggested that the roll cloud generated funnels of wind tending downward and skipping from place to place along the path of the storm. He stated that this skipping action accounts for the rather severe damage in some spots and absence of damage of any kind in others.

Respondent concedes, as he must, that the burden of establishing the defense of inevitable accident rests on him. He further concedes that if a proper display of nautical skill and precaution on his part could have prevented the barge from breaking away, he is responsible for the damage caused thereby. The Louisiana, 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85. He insists that he has successfully undertaken his burden by showing the manner in which the barge was moored prior to the storm and the severity of the storm itself.

█ Unfortunately, the weight of the evidence is against him on both counts. If the vessel had been moored in the manner in which respondent's witnesses have testified it was, nothing short of an earthquake could have set it adrift. And there is nothing akin to an earthquake shown to have occurred in the vicinity of Whiteman's Upper Landing. The two empty barges moored with 1" Manila lines two feet away from the U. S. 141 were undisturbed by the storm. If this phenomenon can be explained on the basis of the skipping action of the wind, then this storm was indeed a very

sprightly and discriminating skipper. With the precision of a slide rule, it would have had to descend on the lines holding the U. S. 141 and leave untouched not only the two light barges alongside it but also the 15 barges at the lower landing, libelant's dock, including the large, flat, raised sign with the expanse of sail area, to say nothing of the canvas top on the little launch moored at the dock.

The truth of the matter is that if these wind funnels did any skipping at all, they skipped over Whiteman's Upper Landing. The high winds generated generally throughout the area by the storm were sufficient to part the obviously meager lines which held this large, hulking vessel, exposing to the wind as it did some 15 feet of freeboard along a hull line of 225 feet, together with 85 feet of "A" frame, as well as the old tug housing. But there is no indication whatever that excessive winds of tornadic velocity hit Whiteman's Landing on the morning in question. There is no evidence even that a single tree in the area was uprooted. The conclusion is irresistible, that if the U. S. 141 had been properly moored, it, too, would not have been uprooted.

Respondent lays much stress on the high reading on the anemometer on the bridge and the damage to the bridge caused by the wind. As shown by the weather report, however, the bridge, and the anemometer, extended into the low-lying roll cloud which generated the alleged winds of tornadic force. The anemometer reading on the bridge, therefore, did not necessarily reflect the velocity of the wind on the ground at Whiteman's Landing some miles away. The testimony further shows that the damage to the bridge was nothing more than damage to repair work which was then in progress on the bridge. The other damage caused by the storm in the general area is in no way proximate to Whiteman's Landing, indicating, of course, that the skipping action of the wind funnels was spent on these areas of damage rather than on the U. S. 141.

The defense of inevitable accident imposes a heavy burden on the defender. In addition to the Act of God, he must clearly demonstrate his freedom from fault before he can be exonerated from payment of damages to property of innocent third parties. The Louisiana, supra. Respondent must have known that the U. S. 141 presented an expanse of sail area on which high winds could operate. Respondent was bound to know that violent squalls are frequent in the early spring in the area of his landing.[1] Fortified with this knowledge, he was bound to moor his barge so that those expected violent storms would not part the mooring lines. This he failed to do. He has not even produced in court for inspection the lines which he claims were parted by the wind. In Riverside Trawling Co., Inc., v. The Vulcan, D.C., 60 F.Supp. 158, 162, Judge Borah said, "In other words, the parted coupling lines were last in the possession of the respondent tug company, which has not produced them. This failure to come forward with the best evidence as to the damaged ropes gives rise to the presumption that the lines, if produced, would constitute mute evidence unfavorable to the tug company." Certainly such lines, if produced, would speak more eloquently, and more convincingly, than respondent's precision witnesses who remember so well the exact manner in which this barge was moored some three years ago. Interstate Circuit, Inc., v.

---

1. In The Mendocino (Mobile, Miami & Gulf Steamship Co., Inc., v. Steamship Mendocino), D.C., 34 F.2d 783, 785, 1929 A.M.C. 1613, 1618, in referring to weather conditions to be anticipated in the New Orleans area, the Court said:

"It is a matter of common knowledge, of which this court will take judicial cognizance, that violent squalls are frequent in and about this harbor in the early spring. Wind of great force is to be anticipated in this navigation, and in my opinion the wind that struck the Mendocino on the occasion in question, while strong, did not exceed in violence any that might be reasonably expected in this locality. The Louisiana, supra."

United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Colvin v. Kokusai Kisen Kabushiki Kaisha, 5 Cir., 72 F.2d 44, 1934 A.M.C. 1116.

Decree for libelant.

