MORAN TOWING & TRANSPORTA-
TION COMPANY, Inc., Libelant,

v.

M/S HOPERANGE and Hopemount Shipping Company, Ltd., Respondents.

W. A. BISSO, Sr., Libelant,

v.

M/S HOPERANGE and Hopemount Shipping Company, Ltd. and Moran Towing & Transportation Company, Inc., Respondents.

Nos. 3329, 3593.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 18, 1964.

Burlingham, Underwood, Barron, Wright & White, Eugene Underwood, New York City, Terriberry, Rault, Carroll, Yancey & Farrell, Walter Carroll, Rufus C. Harris, Jr., New Orleans, La., for Moran Towing & Transportation Co., Inc.

Phelps, Dunbar, Marks, Claverie & Sims, Charles E. Dunbar, III, New Orleans, La., for Mrs. Cecelia Bisso Slaten, Testamentary Executrix of Estate of W. A. Bisso, Sr.

AINSWORTH, District Judge.

This consolidated litigation arose out of the stranding of the M/S HOPE-RANGE on the night of May 13, 1957, near the entrance to the Southwest Pass where the Mississippi River meets the Gulf of Mexico.

On April 10, 1957, a fire severely damaged the engine plant of the HOPE-RANGE while at sea in the Pacific Ocean, thereby rendering her inoperative, a dead ship. Thereafter, Hopemount Shipping Company, Ltd., owners of the HOPERANGE, contracted with Moran Towing & Transportation Company, Inc. to tow the HOPERANGE from Cristobal, Canal Zone, to Galveston, Texas. The JULIA C. MORAN was furnished by Moran for the towing job and departed Cristobal on May 3, 1957, with the HOPERANGE in tow. The starboard anchor of the HOPERANGE was removed, and the towing cable of the JULIA C. MORAN was shackled to the starboard anchor chain.

En route to Galveston the tug received orders to change course to New Orleans as that port was the only one capable of handling the soybean cargo carried by the HOPERANGE. On the morning of

May 13 the flotilla arrived in clear weather but choppy seas at the sea buoy at the entrance to Southwest Pass. The tug W. A. BISSO, owned by W. A. Bisso, Sr., had been engaged to assist the JULIA C. MORAN in towing the vessel into the Pass and up the Mississippi River to New Orleans.

Three attempts were made to bring the HOPERANGE from the Gulf into the Pass. On each attempt the flotilla was made up in the vicinity of the sea buoy which is located about one nautical mile from the bell buoy marking the entrance to the Pass. The channel buoy is about seven hundred yards past the bell buoy. Approximately fourteen hundred yards from the channel buoy are the range lights which the pilots use as a guide when entering the Pass. The bell buoy, channel buoy and range lights are on the port side of a vessel entering the Pass. A red light is on the starboard side of a vessel in the Pass. This light designates the point of land where the Pass turns to the right and is on a diagonal of some six hundred yards from the channel buoy.

The first attempt to enter the Pass was made on the morning of May 13. The W. A. BISSO went out to the HOPE-RANGE where it made up on the port quarter. The JULIA C. MORAN was on the hawser. The weather was clear with 14-knot wind out of the Southeast. The river current was about 5 knots and the seas choppy. The flotilla started in but shortly after getting under way the BISSO parted its lines and the effort was temporarily abandoned.

It was suggested by one of the bar pilots that the vessel be taken to another port because of existing wind, current and sea conditions. Captain Barlow of the JULIA C. MORAN contacted the owners of the HOPERANGE but was refused permission.

In the early evening it was decided that another attempt could be made to enter the Pass while awaiting the arrival of a third tug, the HUMRICK. The wind and sea had subsided. The wind was down to about 9 or 10 knots and the sea described as slight with small ground swells. On this attempt the BISSO was on the hawser and the JULIA C. MORAN made up on the port quarter. The flotilla had gone but a short distance when the BISSO again parted her wire bridles, broke loose from the vessel, and the effort was again stopped.

Three tugs participated in the third and final attempt which ended with the stranding of the HOPERANGE about 9:20 p. m. The weather was clear, with slight seas. The river current was still at 5 m. p. h. and the wind out of the Southeast at about 8 knots. The JULIA C. MORAN (1200 h. p.) was on the hawser with a 2″ cable doubled. The BISSO (2500 h. p.) was made up on the port quarter with a 1¼″ wire towing strap, a 1¼″ doubled head line, and a 2″ wire cable stern line. The HUM-RICK (1700 h. p.) was made up on the starboard quarter with two 1⅛″ wire towing straps, three 1⅛″ head lines, and a 1″ wire cable stern line. As the flotilla approached the channel buoy and the HOPERANGE had begun turning to the right, the BISSO's lines suddenly began breaking up. It was not established which lines broke first but both the tow and head lines broke. The BISSO pulled away and the HOPERANGE, having lost the BISSO's power on the port quarter, went aground in the vicinity of the channel buoy.

Prior to trial, Moran purchased the entire interest and claims of Hopemount by written assignment, released any claims for towing services it had against Hopemount, agreed to hold Hopemount harmless for any claims of Bisso for unpaid services, and Hopemount assigned to Moran its claim against Bisso for damages growing out of the stranding. On this state of facts the case was tried to the court.

We hold that the stranding resulted from the BISSO's breaking away from the HOPERANGE which allowed the vessel to sheer to port and run aground. The primary question before

us is what caused the BISSO to break away. Moran contends that the negligence of Bisso in not using proper cables caused the parting. Bisso contends that it was not negligent, that the accident was inevitable, and that the tug broke away because of the turbulent waters encountered by the flotilla.

■■■■ The burden of proof is on Moran to show by a preponderance of the evidence that the loss or damage sustained was the result of the negligence of the towing vessel. The tug owner is not the insurer of the tow, but he must exercise such reasonable care and maritime skill which the circumstances demand. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); Stall & McDermott v. Southern Cross, 5 Cir., 1952, 196 F.2d 309.

The evidence shows that the W. A. BISSO's wires were not adequate for the task. Bisso contends that he had a number of new wire cables placed on the tug prior to the departure for the mouth of the river. However, the testimony leaves the court with grave doubt as to this contention. The witnesses who testified concerning the purported new cables differed not only as to the number but also as to the size and type of cables brought aboard.[1] There was no regular maintenance or inspection by Bisso of the cables. The evidence produced showed that no one was charged with a duty to check the towing cables. No one ever cleaned the cables and inspected them for wear. The tug captain was supposedly charged with the duty of checking them but Captain Appel, in charge of the BISSO, testified that he never handled the lines. One of the deckhands testified that it was the duty of the deck-

hands to check the lines, but the other deckhand testified that he was never instructed to inspect the cables. The only check made of the lines was by the deckhands as they put the lines out. They would feel for snags on the wires but only on that part of the line they handled.

Neither the HUMRICK nor the JULIA C. MORAN parted lines on the day of the stranding. The BISSO parted lines on the first two attempts in areas where the turbulence of the water was not considered violent even by BISSO. The HUMRICK's lines were not more than a week old. This vessel, which has 800 less horsepower than the BISSO, had lines out which were proportionately larger, and some in fact were larger.[2]

None of the BISSO cables which parted were kept for inspection or testing nor were they produced at the trial of this case. It must be presumed, under the circumstances, that had they been produced the physical evidence of their condition would have been unfavorable to the cause of Bisso.[3] Bisso contends that he never had possession of the cables, that they fell overboard when they parted or that they remained aboard the HOPERANGE, but witnesses testified that portions of the cables remained on the tug and were returned to Bisso's yard for safekeeping on the instruction of Bisso's attorneys.

Bisso contends that the wires parted because of wind, sea and current conditions existing at the time of the third attempt. The evidence does not support this contention. The wind and sea had gradually subsided. In fact, the second attempt was with only two tugs because it was felt that the wind and sea had

---

1. Captain Appel of the W. A. BISSO testified at the Coast Guard hearing that the wires aboard the vessel were not new wires. Captain Appel said, "All those lines had been used before." There was no record or list of the lines allegedly placed on the W. A. BISSO.

2. BISSO had out 2½" bow line, 1¼" spring line and a 2" stern line. The HUMRICK had a 2¼" to 3⅜" bow line

(the testimony on this point is not quite clear), 2¼" spring line and a 1" stern line.

3. Interstate Circuit v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Colvin v. Kokusai Kisen Kabushiki Kaisha, 5 Cir., 1934, 72 F.2d 44; United States v. Johnson, 5 Cir., 1961, 288 F.2d 40.

diminished enough to permit the flotilla to proceed into the Pass. On the third attempt the over-all conditions, although not optimum, were not such as would cause good cables to part.[4] Bisso contends that the log of the HOPERANGE truly depicts the conditions which existed.[5] We are not necessarily bound by what is written in the log book, especially when the overwhelming weight of the testimony contradicts it. The time of the entry in the log is not entirely clear, nor are the events described therein. The log does not compel the court to disregard the testimony.

■ Bisso's primary defense is that of inevitable accident. A party asserting this defense bears a heavy burden. He must show that he is free from fault, also what caused the accident, and that the result was inevitable. He must also show that the accident could not have been prevented by the use of that degree of reasonable care and attention which the situation demanded. The J. N. Gilbert, 5 Cir., 1915, 222 F. 37; Swenson v. Argonaut, 3 Cir., 1953, 204 F.2d 636; Sherwood Refining Company v. Whiteman, D.C., E.D.La., 1955, 127 F.Supp. 478. Bisso has not sustained his burden because he has failed to prove that the turbulence in the Pass or any other sufficient reason was the cause of the accident. The captain of the W. A. BISSO was well aware of the existing conditions and took no extra precautions to meet the conditions, which are now alleged by Bisso to have caused the accident. Bisso has not produced the cables and here again fails to show that he was not at fault.

Bisso has alleged that Moran was negligent in attempting to bring an inoperative ship into the Pass under the then prevailing conditions. It is also alleged that the HOPERANGE was unseaworthy because its starboard anchor was not

rigged and ready to go and that the flotilla was not properly aligned on the ranges. But the wind, sea and current on the third attempt were not such as created undue risk or hazard. The HOPERANGE was a dead ship which was being brought to New Orleans because of available facilities there. It is true that bringing the vessel into the Pass presented some difficulties but they were not such as would make a party negligent who attempted such a passage. Bisso made no objection nor did he refuse the towing job. All who were primarily concerned with the entry felt that it would be made without further difficulty and that with three tugs there would be ample power.

■ The fact that the HOPERANGE did not have its starboard anchor rigged does not make it unseaworthy nor was it negligence. It was a dead ship. It would have taken outside power to rig the anchor. It is not reasonable to expect the vessel to obtain outside power any more than it could be expected that the fire damage would be repaired at sea. The HOPERANGE was without its starboard anchor from the beginning and the W. A. BISSO was aware of this fact. In addition, it was not established that dropping of the HOPERANGE's anchor would have prevented the stranding. The absence of the starboard anchor was not, in our opinion, a proximate cause of the accident.

The evidence shows that the flotilla was proceeding in on the ranges. There was some testimony that the HOPERANGE was not on the ranges, but this was given by persons who were not directly concerned with the approach. The pilots testified that the vessel was proceeding in on the lights and this was their primary concern. The flotilla was making a proper entry until the BISSO parted her wires.

---

4. Wind about 8 knots and current about 5 m. p. h.

5. The rough log of the HOPERANGE has the following entry for 2000 hours:

"Slight sea, cloudy, fine and clear. Heavy ground swell causing tugs to do extensive damage to plating on port side and wires and ropes to part."

Bisso seeks to limit his liability and to do this he must affirmatively show that the negligence which caused the stranding was not within his privity or knowledge. The term "knowledge" means not only personal cognizance but also the means of knowledge of which a party must avail himself in order to prevent a condition likely to produce or contribute to a loss. The Cleveco, 6 Cir., 1946, 154 F.2d 605. An owner is duty bound to see that a vessel has equipment which is safe and in good working order. In re Jacobson, D.C., S.D.Tex., 1931, 52 F.2d 179.

In view of our findings as to the cause of the stranding and because the facts show that Bisso had no adequate or regular inspection or maintenance of the towing cables, we hold that Bisso has not sustained his burden to show that he was without privity or knowledge of the negligence which caused the stranding. Mr. Blancq was the Port Engineer for Bisso and he knew that no regular inspection or maintenance of the towing cables was made. This knowledge is attributable to Bisso. Bisso is, therefore, denied limitation of liability.

We hold, therefore, that the petition of Bisso for limitation should be denied and that an interlocutory decree on the issue of liability be entered in favor of Moran and against Bisso, holding Bisso solely at fault. Damage questions are not decided here, nor have we as yet passed on the question whether Moran shall be entitled to recover its assignor's (Hopemount) damages in full and not limited to the amount it paid for the assignment.