ATLANTIC BANANA COMPANY,
Plaintiff,

v.

M.V. "CALANCA", her engines,
boilers, etc.,

and

St. Gotthards Schiffahrts A.G.,
Defendants.

No. 66 AD. 673.

United States District Court,
S. D. New York.

March 30, 1972.

Bigham, Englar, Jones & Houston, New York City, for plaintiff; Vincent L. Leibell, Jr., Robert J. Williams, New York City, of counsel.

Hill, Betts & Nash, New York City, for defendants; Donald B. Allen, Stephen J. Murray, New York City, of counsel.

## OPINION

BRIEANT, District Judge.

This cause was tried before the Court, without a jury, on December 21, 1971, and has been fully briefed.

The complaint, verified June 24, 1966, was filed by Atlantic Banana Company, a Florida corporation, suing in its own behalf, and for the benefit of Pan American Fruit Company, for which it acted as agent in connection with the shipment of bananas from Puerto Bolivar, Ecuador, and, more specifically, as agent in connection with prosecuting this claim for damages to the bananas.

Defendant is the owner of the M.V. "CALANCA". It is a Swiss corporation, not present in this District. The CALANCA is said to be of Swiss registry, a merchant marine counterpart of the legendary Swiss Navy.

The owner answered the complaint by a pleading verified January 24, 1969. No claim of owner with respect to *in rem* jurisdiction was filed. However, after the evidence had been taken by the Court, the parties stipulated in writing that defendant's objection to *in rem* jurisdiction be withdrawn, and a claim of owner is deemed to have been filed. It was further stipulated that claimant's answer shall be deemed "the same as that of the vessel owner, now on file"

(Stipulation and Order dated January 3, 1972). It was also stipulated at the same time that a Charter Party dated January 17, 1963, between defendant and Cornell Shippers, which Charter Party had been assigned to Federal Transport Co., and admitted into evidence as Exhibit B, be withdrawn as an Exhibit, and "neither party will claim against each other under the Charter Party."

It was agreed that the sole issue to be tried is that of liability. Damages are to be settled by agreement, and, in the absence of agreement, the issue is to be tried separately.

The CALANCA was a diesel driven, propeller operated motor ship with electrically operated refrigeration, particularly adapted to the banana trade. She had been regularly engaged for some time in the carriage of bananas under refrigeration from Central American ports to South Atlantic and Gulf ports of the United States. Not being powered by steam, she was dependent on electricity for operating the ship's gear and the refrigeration.

Bananas are regularly carried from Central American ports to the United States in refrigerated ships. They are loaded at an ambient temperature between 74 and 78 degrees Fahrenheit, and must be brought down as promptly as possible to approximately 52 degrees Fahrenheit, and are thereafter carried during the voyage at that temperature, and so maintained until discharge. This delays the ripening of the bananas, which are cut green, for about six to ten days, for purposes of transportation and exposure to sale. The practice, known to defendant and its Master, is to cut bananas specifically for a shipload, since they must be loaded within 10 to 24 hours of cutting, including an allowance for time in transportation from the plantation to the pier. During pre-cooling, prior to and during loading and stowage, a temperature of 35.5 degrees Fahrenheit is established, to bring the cargo down to the required temperature for the carriage.

The CALANCA had three diesel operated electric generators coupled to transformers and related linkage, termed as "Auxiliary I, II and III," generally used for the generation and application of all the electrical energy on shipboard. As noted, the same electricity which operated the vessel also operated the refrigeration. It was possible for the vessel to navigate, and to pre-cool for and refrigerate a newly loaded cargo with two working generators, and the third generator, in effect, constituted a reserve supply of power.

In a prior voyage from Cristobal to Gulfport on June 18, 1965, while carrying a cargo of bananas originating at Guayaquil, one of the transformers had failed in connection with one of the three available units of electrical generating equipment known as Auxiliary No. I.

The Master caused the inoperative transformer to be removed from the vessel for repairs at Gulfport. The part had not been returned or replaced when the vessel broke ground for Puerto Bolivar on June 22, 1965, so that when the vessel arrived in Puerto Bolivar she had only two operative generators. The charterer had nominated the vessel to go to Puerto Bolivar to load a particular cargo of bananas, and plaintiff, and its assignor, Pan American Fruit Company, had, by cable, directed its Guayaquil agent, Bananas, S.A., to cut and ready for shipment 37,545 boxes or cases of bananas, each at 43 lbs. net weight, for the CALANCA. When the vessel arrived at the pier, these bananas had been cut and were on the pier, ready to be lifted by the CALANCA. The CALANCA had commenced pre-cooling her cargo holds, and at 1330 hours on June 30th, loading was commenced. Both generators were working adequately, but the third generator, No. I, remained inoperative since prior to leaving Gulfport. The temperature in the holds was satisfactory when loading was commenced.

The usual tally sheets were being prepared, and as to these, the Master or his duly authorized agent was a participant.

Loading and stowage of the bananas was commenced, with leave of the Master at 1330 hours on June 30, 1965, by a stevedore designated by plaintiff's Guayaquil agent. At 1836 hours on that day, the electrical equipment of Auxiliary No. III failed. It was ascertained that the rectifier was inoperable and pitted. Efforts to make repairs at Puerto Bolivar were unsuccessful and attempts to reconstruct the inoperable rectifier with parts taken from Auxiliary I, as well as attempts to shift the transformer from No. III Auxiliary into the No. I to replace that component which, as noted, had been removed at Gulfport, were also unsuccessful. While the vessel's officers and men were attempting to effectuate emergency repairs, the loading continued until 2300 hours on June 30, 1965, when it was finished for the day.

The Master recognized the existence of an emergency. His attempts to reach the local representative of Bananas, S. A., which began at 0050 hours on July 1st, were unsuccessful, until 0800 hours on July 1st, when the Master informed Bananas, S.A. in Guayaquil of the emergency, and asked for "the best electrical engineer with all spare parts available." An engineer, Mr. Lovinger, retained by plaintiff's agent, arrived at 1100 hours on July 1st. His attempts to reestablish the electrical supply were unsuccessful.

In the meantime, on July 1st, the loading of the bananas continued into hatches which the Master believed, correctly, could be refrigerated with only one Auxiliary working, but at 1145 hours, the Master refused to allow the loading of bananas to begin in Hatch No. 1, as this area could not be refrigerated unless at least two of the Auxiliary generators were operating. Those other hatches which had been fully loaded with bananas were properly closed and the temperature maintained. On the morning of July 2nd, the Master again refused to

accept further cargo aboard the vessel due to lack of refrigeration in the hatches not previously loaded and stowed. Plaintiff's agent at all times demanded that loading continue.

A dispute then arose between the Master and the shipper's agent. Local police and army representatives boarded the vessel and issued an arrest to prevent the vessel from dumping any bananas. The bananas remaining on the pier were not taken aboard, and although the one generator was still operating, and was refrigerating the bananas previously loaded and stowed, these bananas were, commencing at 0730 hours on July 4, 1965, discharged from the vessel at the Master's direction. Because of the time which had elapsed since their cutting, and the lack of alternative transportation available in Puerto Bolivar, these bananas at that time had no economic usefulness, and the shippers lost the value thereof. Efforts were made with aid of the Army to distribute the bananas to charity. A replacement transformer finally arrived after the cargo had been discharged and disposed of. Power was restored on July 6, 1965.

None of the boxes or cartons of bananas were transported on the CALANCA. Neither plaintiff nor Pan American Fruit Company had any express contract with defendant or with the time charterer, Federal Transport Co. No bill of lading had been issued, although in the regular course of business, a customary ocean bill of lading subject to and incorporating all provisions of COGSA would have been issued, after the cargo had been fully loaded and stowed and the tally sheets verified on behalf of the ship. Bananas, S.A., or its Guayaquil agent, apparently had authority to cause a bill of lading to be issued for the account of the vessel, and to be signed by or on behalf of the Master.

This is the normal fashion of issuing a bill of lading in such matters. Since the bananas are stacked on the pier by others, under circumstances not allowing for verification of the count of boxes by the ship, it is not possible to issue a bill of lading until the tally sheets have been completed, in the course of having the cargo loaded and stowed. This had not been completed.

The vessel was nominated for this particular cargo, and went to Puerto Bolivar solely for the purpose of lifting and transporting this highly perishable cargo which had been cut for this shipment. When the CALANCA ceased loading, there was no alternate means available to salvage or transport the cargo. I perceive no legal distinction between those bananas which were loaded, and discharged, and those not loaded. As to the entire cargo, there existed an implied or oral contract of carriage, and the liability of the ship as to all of the cargo, should not depend on the fact that loading was halted by the Master.

Before loading ceased, there were loaded and stowed on the vessel, 17,648 boxes of bananas, and of these, 17,500 belonged to Atlantic, and the balance, 148, belonged to Pan American Fruit. Considering the total number of boxes of bananas delivered to the pier for transport by the CALANCA, Atlantic was the owner of 22,472 boxes and Pan American Fruit was the owner of the remaining 15,073.

Plaintiff may assert the rights of Pan American Fruit Company in respect to this loss, and I find that it has express authority from its principal so to do.

The delicate nature of bananas, which necessitates special care in transportation, is recognized by the Courts. Horn v. Cia de Navegacion Fruco, S. A., 5 Cir., 404 F.2d 422 (1968). An ocean carrier is required to know the special characteristics of a cargo it accepts for carriage. See Bank Line v. Porter, 4 Cir., 25 F.2d 843 (1928). As noted in Thomas' treatise, Stowage, The Properties and Stowage of Cargoes:

"The successful carriage of bananas requires much more refrigeration power than is necessary for meat or other refrigerated carriers, so that while the banana carrier is quite suit-

able to carry citrus fruits, apples, etc., a vessel designed and equipped solely for the carriage of the latter would not necessarily carry bananas satisfactorily over a long voyage." (at 467)

The vessel broke ground at Gulfport, with one of the three Auxiliaries down for repairs (No. I). At the same time, the rectifier of Auxiliary III, which failed during the loading of the vessel, was pitted and holed. After its failure, the transformer was found to be burned, and the main switch on the panel had a mechanical imperfection. Auxiliary II, although still operating, had its rectifier slightly pitted.

The advanced stage of deterioration of this equipment demonstrates that due diligence was not used by the defendant to inspect and maintain these essential components of the ship's gear.

■ A mere visual inspection of these appliances is not, in and of itself, sufficient under the circumstances of this case, to sustain the required burden on the owner to maintain the ship in a seaworthy condition. As noted in Union Carbide & Carbon Corp. v. The Walter Raleigh, D.C., 109 F.Supp. 781 (1951), aff'd, 2 Cir., 200 F.2d 908 (1953):

"The rule as to inspections requires that the inspection be made before the vessel breaks ground. Seaworthiness of a part of the ship's equipment on the voyage just ended is not sufficient. Some things might happen to the equipment while the vessel is in port. It may be because of this possibility that a proper inspection is supposed to be made prior to commencement of each voyage." See also Warner Sugar Refining Co. v. Munson S S Line, 23 F.2d 194 (1927), aff'd, 32 F. 2d 1021 (1929).

In The Southwark, 191 U.S. 1, 24 S. Ct. 1, 48 L.Ed. 65 (1903), the Supreme Court held:

" * * * For the purpose of properly discharging the duties involved in such transportation, vessels provided with refrigeration apparatus have been put into service and compete with others for this branch of the carrying trade. The owners of such vessels hold them out to shippers and invite their trade upon the representation, actual or implied, that the apparatus provided is fit to receive and carry the meat in proper condition to its destination. For this service freight charges are doubtless made commensurate with the advantage furnished. The shipper has no control over the apparatus. It is under the supervision and care of the vessel owner, inspected and operated by those in his employ."

■ The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898); International Navigation Company v. Farr & Bailey Manufacturing Company, 181 U.S. 218, 21 S.Ct. 591, 45 L.Ed. 830 (1901). This duty is non-delegable, and the excuse of due diligence used, is strictly construed against the shipowner. Standard Oil Co. v. Anglo-Mexican Petroleum Corp., D.C., 112 F.Supp. 630 (1953); Ore Steamship Corporation v. D/S A/S Hassel, 2 Cir., 137 F.2d 326 (1943); International Navigation Co. v. Farr & Bailey Manufacturing Company, *supra*; The Leerdam, 5 Cir., 17 F.2d 586 (1927); Compagnie Maritime Francaise v. Meyer, 9 Cir., 248 F. 881 (1918); Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780 (1946).

■ I find the CALANCA unseaworthy, as to her electrical generating equipment and, consequently, as to her refrigeration facilities, when she broke ground at Gulfport en route to Puerto Bolivar, and at all material times thereafter. Departure with one Auxiliary shut down for repairs, in itself would constitute unseaworthiness under these circumstances, and the poor state of maintenance of the other two Auxiliaries makes the unseaworthiness more evident. The Steel Navigator, 2 Cir., 23 F.2d 590 (1928).

I find that the unseaworthiness of the vessel was the proximate cause of the

loss of the bananas. The Master himself noted that:

"Not only is the refrigeration for the area remaining to be loaded inoperative, but also the vessel cannot sail with 17,648 boxes already stowed aboard as the vessel cannot cool and refrigerate the loaded quantity of bananas and navigate both together." (Exhibit 2)

An action by an owner of goods against a carrier for neglect to carry and deliver in safety, is an action for the breach of a duty imposed by law, independently of contract or of consideration and therefore founded in tort. The John G. Stevens, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969 (1898).

The owner of a cargo has a lien on the vessel for an injury that he may sustain by the fault of the vessel or the Master. No lien arises on the vessel as security for the performance of the contract to transport until an agreement of affreightment has been made, and the cargo to which it relates has been delivered to the custody of the Master or someone authorized to receive it.

The Master and the crew of the CALANCA were hired and paid by the owner. The owner had the duty to keep the vessel seaworthy. That duty runs to any plaintiff who, foreseeably, is damaged as a result of the breach of that duty.

Defendants contend that the only existing written contract was the charter party, and since plaintiff was not a signatory, no liability may be asserted.

While it is true that only a party to a contract of affreightment can maintain suit upon the contract, in the instant case there was an implied contract of affreightment, which arose when the CALANCA arrived at Puerto Bolivar and commenced lifting cargo. See Armour & Co. v. Fort Morgan S S Co., 5 Cir., 297 F. 813 (1924); The Poznan, 2 Cir,. 276 F. 418 (1921).

Oral or implied contracts of affreightment are valid, although the usual practice is to have such contracts in written form, as a charter party or bill of lading. See Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

Defendant asserts that no liability attaches in law to a vessel or its owner until a bill of lading is physically issued. COGSA, 46 U.S.C. § 1303(3) (a), (b), (c) requires the issuance of such a bill of lading, as does the Harter Act, 46 U.S.C. §§ 190–196. A bill of lading, would have been issued, as a matter of course, when loading was complete, and the bananas accurately tallied. Neither the fact that the bill was not issued, nor the fact that the Master stopped the loading, serves to exonerate the vessel. Indeed, under the terms of COGSA, the bill of lading need not be issued until all of the cargo is received into the charge of the carrier and then, only upon demand of the shipper. 46 U.S.C. § 1303(3).

Although Section · 1305 of COGSA provides in part that "the provisions of this chapter shall not be applicable to charter parties," Section 1301(b) thereof provides that bills of lading issued under or pursuant to a charter party are contracts of carriage under the Act "from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same." This provision has been interpreted to mean that a bill of lading issued by the carrier to a shipper who is also a charterer is a mere receipt, and the relations of the parties are governed by their charter party. Jefferson Chemical Co. v. M/T Gretna, D.C., 292 F.Supp. 500 (1968). See Knauth, Ocean Bills of Lading, 178 (1953). Although the parties have agreed that no claim would be made under the charter party, and thus its terms become irrelevant, the type of charter party may be significant to the determination of liability. It was stipulated by the parties that a time charter was in existence.

A time charter such as existed between Federal and defendant

owner is a specific and express contract by which the owner lets a vessel or some particular part thereof to another person for a specified time or use. The owner continues to operate the vessel, contracting to render services by his Master and crew to carry goods loaded on the vessel. The Master and crew remain servants of the owner. Lucas, Admiralty, Cases & Materials (1969). The liability of the owner is predicated upon its ownership of an unseaworthy vessel. Jones & Laughlin Steel Corp. v. Vang, 3 Cir., 73 F.2d 88 (1934). Naturally, plaintiff could not have sued on the charter party since it was not privy to it, although plaintiff's shareholders owned 95% of charterer's stock.

If the relationships between these parties are considered to be governed by general principles of maritime law, without regard to the statutes, then the warranty of seaworthiness is absolute, and defendant is liable for all damages proximately resulting from its breach. If the relationship is regulated by COGSA, then the warranty is no longer absolute, but the burden of proof is placed upon the shipowner to establish that he used due diligence to make the vessel seaworthy, COGSA, 46 U.S.C. § 1303(1); W. R. Grace & Co. v. Panama R. Co., 2 Cir., 285 F. 718 (1922). Under the Harter Act, 46 U.S.C. §§ 190–196, the burden is upon the owner to establish due diligence by the making of proper and reasonable tests so as to insure the vessel's seaworthiness, and any doubt must be resolved in favor of the shipper.

Under the record before me, the vessel and its owners did not discharge the burden of proving due diligence exercised with respect to the electric equipment at or prior to the time that the vessel broke ground in Gulfport, to effect seaworthiness. The unseaworthiness of the CALANCA was readily apparent, as is more fully set forth *supra*, pages 449–451.

■ Accordingly, it is of no consequence, for the purposes of disposing of this litigation, whether the standard of responsibility of defendants be judged under COGSA, under the Harter Act, or under general principles of maritime law, as liability will follow under any standard.

■ COGSA applies "from the time when the goods are loaded on to the time when they are discharged from the ship." During such portion of a foreign carriage of goods, the substantive sections of the Harter Act are suspended by COGSA. See Gilmore and Black, The Law of Admiralty, (1957), Sections 3–25. The Harter Act, 46 U.S.C. § 190 et seq., applies to foreign carriage by sea under bills of lading. It has reference to duties affecting loading, stowage, custody, care and delivery, 46 U.S.C. §§ 190–191. Custody and care would seem to reach from that period of time from receipt by the carrier until delivery. That statute accordingly would apply in the absence of agreement to the contrary, to that period even in foreign trade, during which the carrier has custody of the goods before they are loaded on the ship. That was the status of that portion of the banana cargo which had been placed on the pier under the exclusive custody, control and dominion of the vessel, solely for loading, but not actually loaded at the time when the Master stopped the stevedore. Mackey v. United States, 2 Cir., 197 F.2d 241 (1952).

■ Neither statute, each of which obligates the owner, Master or agent, to issue a bill of lading, speaks of any specific time when the bill must issue. Under COGSA, the bill is to be issued on demand. 46 U.S.C. § 1303(3). Likewise, under the Harter Act, there is no specification as to when the bill must issue. Logic dictates, however, that no bill of lading could be issued for boxes of bananas, in the absence of a tally competently prepared under the supervision of the Master, which would tell him the number of boxes for which a bill should be issued. Under normal circumstances, this information would not be available until loading was completed.

Based upon the foregoing, I find the defendant and the vessel liable to the plaintiff for the reasonable value of all of the aforementioned boxes of bananas at Puerto Bolivar on June 30, 1965. Such recovery is both *in personam* and *in rem*. All motions to strike evidence are denied.

The foregoing constitutes the findings of fact and conclusions of law in this case.

As heretofore noted, damages are to be computed by agreement, or, if agreement may not be reached, by a separate trial. Settle Judgment on waiver of notice, containing the stipulated amount of damages, with interest since July 1, 1965, costs and disbursements, or, if Judgment cannot be so settled, submit on notice an Order providing for a reference of the computation of damages to a Magistrate, to be included in a final Judgment to be settled on notice before me.